# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 13, 2001 Session Heard at Memphis

## CONNIE JEAN GIVENS  v.  ED MULLIKIN, ADMINISTRATOR
## *AD LITEM* OF THE ESTATE OF LARRY McELWANEY, ET AL.

**Appeal by Permission from the Court of Appeals, Western Section
Circuit Court for Shelby County
No. 95241 T.D.    Hon. John R. McCarroll, Jr., Judge**

---

**No. W1999-01783-SC-R11-CV - Filed March 25, 2002**

---

The principal issue in this case is whether an insurance carrier and an insured may be held vicariously liable for the alleged tortious actions of an attorney hired to defend the insured.  The trial court held that the plaintiff's complaint stated a claim of vicarious liability against the defendant insured and his insurance carrier for abuse of process, inducement to breach express and implied contracts of confidentiality, inducement to breach a confidential relationship, and invasion of privacy.  The Court of Appeals affirmed the trial court's ruling with respect to the vicarious liability issue, though it dismissed the claims for inducement to breach a confidential relationship and invasion of privacy.  The defendants then appealed to this Court, and we now hold that an insurer and an insured may be held vicariously liable for the tortious acts or omissions of an attorney hired to defend the insured, if the attorney's tortious actions were directed, commanded, or knowingly authorized by the insurer or by the insured.  We further hold that the complaint in this case states a claim of vicarious liability against the insurer alone for abuse of process.  The judgment of the Court of Appeals is affirmed in part and reversed in part.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the Court of
Appeals Affirmed in Part, Reversed in Part; Case Remanded**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined.

Nathan W. Kellum, Memphis, Tennessee, for the appellant, Ed Mullikin, administrator *ad litem* of the estate of Larry McElwaney.

Leo Bearman, Jr., Robert M. Glover, and Launice P. Sills, Memphis, Tennessee, for the appellant, Allstate Insurance Company.

William H. Fisher, III, Memphis, Tennessee, for the appellee, Connie Jean Givens.

## OPINION

## FACTUAL BACKGROUND

We granted permission to appeal in this case to review whether the trial court should have granted a motion to dismiss a complaint under Tennessee Rule of Civil Procedure 12.02(6) for the failure to state a claim upon which relief may be granted. The plaintiff, Ms. Connie Jean Givens, has alleged that an attorney hired by Allstate Insurance Company to defend one of its insureds committed several torts within the context of that representation, thereby rendering Allstate and its insured vicariously liable for the attorney's actions. Because a motion to dismiss under Rule 12.02(6) admits the truth of all of the relevant and material averments contained in the complaint, see, e.g., Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn. 1997), we "must construe the complaint in favor of the plaintiff, accept the allegations of fact as true, and deny the motion unless it appears that the plaintiff can establish no facts supporting the claim that would warrant relief," see, e.g., Doe v. Sundquist, 2 S.W.3d 919, 922 (Tenn. 1999).

As alleged in the plaintiff's complaint, the underlying facts of this case arose out of a 1988 traffic accident involving the plaintiff and the defendant, Larry McElwaney.[1] After the plaintiff filed suit against McElwaney to recover damages, his insurance carrier, Allstate Insurance Company, hired Mr. Hal Nichols, "a highly competent and effective Memphis attorney," to represent McElwaney. Sometime after Mr. Nichols substantially completed discovery in the case, including deposing the plaintiff, submitting interrogatories, and obtaining the plaintiff's medical records, Allstate fired Mr. Nichols and employed the Richardson Law Firm to represent McElwaney.

According to the plaintiff, as soon as Allstate hired the Richardson Firm, the Firm began the discovery process anew to harass her, to cause her to suffer unnecessary expense, and to "weaken [her] resolve to pursue the suit to the extent that she [would] abandon it." The Richardson Firm is first alleged, as an agent of Allstate and McElwaney, to have submitted an excessive number of interrogatories, totaling about 237 questions and subparts, even though it already possessed much of the information requested by the interrogatories. Although the plaintiff asserts that she objected to the initial submission of interrogatories by the Richardson Firm, she relates that the trial court overruled her objection.

The plaintiff also alleges that the Richardson Firm deposed her for a second time, subjecting her to "intense questioning about every aspect of her social, educational, employment, and medical history." Lasting about eight hours, this second deposition is alleged to have inquired as to whether the plaintiff "had been sleeping with the Defendant McElwaney," and as to "every ailment with which [she] has ever been beset, no matter how trivial." The plaintiff was also called upon to furnish

---

[1] Mr. McElwaney passed away during the course of this litigation, and Mr. Ed Mullikin, as administrator *ad litem* of the estate, was substituted as the party defendant. Any references to Mr. McElwaney, of course, include Mr. Mullikin as the proper party appellant in this Court.

the names of every doctor, dentist, and other healthcare professional who treated her for these ailments.

Further, the Richardson Firm is alleged to have issued more than seventy discovery subpoenas to various records custodians. Despite knowing that many of these records possessed no relevance to the issues in the plaintiff's suit, the Richardson Firm is alleged to have sent subpoenas to (1) "every custodian for every healthcare professional who was suspected . . . to have rendered treatment to the plaintiff at any time during her life," including her psychologist, her obstetrician/gynecologist, and others; (2) every "hospital in Memphis and Chattanooga (where the plaintiff once lived), even though in many instances[,] the Richardson Firm had no reason to believe that the Plaintiff had received treatment there"; (3) every employer for whom the plaintiff has ever worked; (4) every automobile repair agency to which the plaintiff's automobile has ever been taken; and (5) every insurance company that has written a policy of insurance for the plaintiff.

In no case, however, did the Richardson Firm actually depose a records custodian. Instead, all but six of the discovery subpoenas stated that the custodian could send a copy of the plaintiff's "entire file" to the Richardson Firm "in lieu of personal appearance." The Richardson Firm also notified the plaintiff's attorney that depositions of records custodians would not be taken unless the plaintiff objected. After receiving this notice, the plaintiff's attorney wrote letters to these custodians directing them not to comply with the subpoenas.

The plaintiff then moved to quash a group of four specific subpoenas under Rule of Civil Procedure 45.07,[2] with each subpoena being representative of a greater class. The trial court granted the plaintiff's motion and quashed the subpoenas, finding that the plaintiff's failure to object was not the equivalent of an "agreement" as contemplated by Rule 45.07. The Court also ruled that the plaintiff had not waived her right to complain of the subpoenas by failing to object to each individually. However, following the court's ruling, the Richardson Firm is alleged to have continued to issue similar subpoenas, for both discovery and trial purposes, to various records custodians.

On June 12, 1998, the plaintiff filed a separate action alleging (1) that the Richardson Firm's discovery practices constituted an abuse of process, and (2) that its practice of obtaining her medical records through use of the defective subpoenas invaded her right to privacy and induced the medical practitioners to breach their confidential relationships with her. The plaintiff also alleged that the Richardson Firm induced her treating physician to breach express and implied contracts of confidentiality with her by privately speaking with him outside a deposition. However, the plaintiff did not sue the Richardson Firm directly, but she instead sued McElwaney and Allstate, alleging that each was vicariously liable for the tortious actions of the Richardson Firm.

---

[2] Rule of Civil Procedure 45.07 provides that "[e]very subpoena issued and served under any part of this Rule 45 for testimony, books, papers, documents, or tangible things must command the witness to appear at a trial, hearing, or deposition unless otherwise provided by statute or by agreement of all parties."

Both McElwaney and Allstate filed motions to dismiss the complaint pursuant to Rule of Civil Procedure 12.02(6) for failure to state a claim upon which relief can be granted. Each defendant alleged that they could not be held vicariously liable for the actions of the Richardson Firm as alleged, but that even if they could, the complaint did not allege sufficient facts to grant the plaintiff relief on any claim. The trial court held a hearing on the motion, and on October 9, 1998, it denied the motions to dismiss.

McElwaney and Allstate then requested permission from the trial court to seek interlocutory appeal, which the court granted under all three grounds listed in Tennessee Rule of Appellate Procedure 9(a). On January 26, 2000, the Court of Appeals granted interlocutory appeal on these grounds, and it later affirmed the trial court's holding that the defendants could be held vicariously liable for the actions of the Richardson Firm. The intermediate court also found that the complaint stated causes of action for abuse of process and inducement to breach contracts of confidentiality. However, it dismissed the plaintiff's claims for invasion of privacy and inducement to breach a confidential relationship.

We then granted McElwaney and Allstate permission to appeal on the issues of whether they may be held vicariously liable for the Richardson Firm's actions and whether the complaint properly alleges claims for abuse of process and inducement to breach express and implied contracts of confidentiality. The plaintiff, as appellee, has also raised the issues of whether the Court of Appeals properly dismissed her claims for invasion of privacy and for inducement to breach a confidential relationship.

For the reasons given herein, we hold that an insurer and an insured may be held vicariously liable for the tortious acts or omissions of an attorney hired to defend the insured, if the attorney's tortious actions were directed, commanded, or knowingly authorized by the insurer or by the insured. We further hold that the complaint in this case states a claim of vicarious liability against Allstate, but not against McElwaney, for abuse of process. The remaining claims against Allstate, and all of the claims against McElwaney, are dismissed. The judgment of the Court of Appeals is affirmed in part and reversed in part.

## I. ALLEGATIONS OF VICARIOUS LIABILITY

The two threshold issues in this case are (1) whether Allstate, as the insurance company that hired the Richardson Firm to defend McElwaney, may be held vicariously liable for that firm's alleged tortious conduct, and (2) whether McElwaney, as the insured and the sole client of the attorney, may also be held vicariously liable for the firm's alleged tortious actions. Because the relationship of each defendant to the Richardson Firm differs in several aspects, we take the time to examine each relationship individually and discuss the possible bases, if any, for imposing vicarious liability in this context.

## A. RELATIONSHIP OF THE INSURER TO COUNSEL HIRED TO DEFEND AN INSURED

Addressing the claims against Allstate first, the plaintiff asserts that Allstate is liable for the actions of its attorney hired to defend an insured because that attorney acts as a general agent for the insurer. On the other hand, Allstate argues that it cannot be held vicariously liable for the actions of an attorney hired to defend an insured, because such an attorney is properly characterized as an independent contractor, rather than an employee, of the insurance company. We agree that Allstate's characterization of the relationship in this regard is generally the more accurate of the two, but we disagree that an attorney's status as an independent contractor invariably forecloses the possibility that the insurer can be held vicariously liable for the tortious actions of that attorney.

In the typical situation in which an insurer hires an attorney to defend an insured, the relationship of the insurer and its attorney is precisely that of principal to independent contractor. For example, the attorney is engaged in the distinct occupation of practicing law, and this occupation is one in which the attorney possesses special skill and expertise. Moreover, the attorney generally supplies his or her place of work and tools; the attorney is employed and paid only for the cases of individual insureds; and he or she alone, consistent with ethical obligations to ensure competence and diligence in the representation, determines the time to be devoted to each case. Finally, and obviously, the practice of law is not, nor could it be, part of the regular business of an insurer. Cf. Youngblood v. Wall, 815 S.W.2d 512, 517 (Tenn. Ct. App. 1991) (listing similar factors to determine whether an employment relationship enjoys the status of principal-independent contractor).

Moreover, an insurer in Tennessee clearly possesses no right to control the methods or means chosen by an attorney to defend the insured. Cf. Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991) (stating that the most important factor to consider in determining whether one is an independent contractor is whether the principal has the right to control or direct the time, place, methods and means by which work is being done). As we stated in In re Youngblood, 895 S.W.2d 322, 328 (Tenn. 1995), the insurer "cannot control the details of the attorney's performance, dictate the strategy or tactics employed, or limit the attorney's professional discretion with regard to the representation [of the insured]." See also Tenn. Bd. of Prof'l Responsibility, Formal Op. 88-F-113 (Aug. 2, 1988) (stating that this principle is "a basic and elementary element of the client-attorney relationship"). In addition, we also affirmed without reservation that "[a]ny policy, arrangement or device which effectively limits, by design or operation, the attorney's professional judgment on behalf of or loyalty to the client is prohibited by the Code, and, undoubtedly, would not be consistent with public policy." Youngblood, 895 S.W.2d at 328. Therefore, because the insurer lacks this important right of control, an attorney hired by an insurer to defend an insured must be considered, at least initially, to enjoy the status of an independent contractor.[3]

---

[3] Indeed, in Youngblood, we even characterized an attorney hired to defend an insured as "an independent contractor engaged by the insurer." 895 S.W.2d at 328.

However, while the rule is that a principal is not generally liable for the tortious actions of an independent contractor, see, e.g., Hutchison v. Teeter, 687 S.W.2d 286, 687 (Tenn. 1985); Carr by Carr v. Carr, 726 S.W.2d 932, 933 (Tenn. Ct. App. 1986), this rule is subject to many exceptions, and our finding that an attorney in this context should generally be regarded as an independent contractor does not, *ipso facto*, relieve the insurer of all liability from the attorney's acts or omissions. Chief among the some twenty-four exceptions to this general rule listed in the *Restatement (Second) of Torts* is that contained in section 410, which provides that when an independent contractor acts pursuant to the orders or directions of the employer, then the employer "is subject to the same liability . . . as though the act or omission were that of the employer himself." Several states have also recognized that when a principal directs or orders an independent contractor to act or fail to act, the principal cannot later assert the agent's status as an independent contractor as a defense to liability.[4]

We are aware of no Tennessee case previously recognizing this principle, but it is certainly consistent with our general common law of agency, which holds that when one directs, orders, or knowingly authorizes another to perform an act, then the principal is liable for the harm proximately caused by those acts. See White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 723 (Tenn. 2000); Kinnard v. Rock City Constr. Co., 39 Tenn. App. 547, 551, 286 S.W.2d 352, 354 (1955). Indeed, liability for the directed or authorized acts of an agent may follow irrespective of whether other separate agency relationships also exist. See White, 33 S.W.3d at 723 (stating that a principal may be held liable for an agent's tortious act, "even if that act occurs outside of the scope of the agency, if the act was commanded or directed by the principal"). Because a principal's *right* to control an agent, in some cases, is "not necessarily as important as the principal's exercise of *actual* control over the agent," id. (emphasis added), we must recognize that a principal can be held liable for the harm caused by the directed or knowingly authorized acts of an agent, even if that agent would otherwise be considered an independent contractor in the absence of any such direction or authorization.

Consequently, although an insurer clearly lacks the *right* to control an attorney retained to defend an insured, we simply cannot ignore the practical reality that the insurer may seek to exercise *actual* control over its retained attorneys in this context.[5] While this practical reality raises

---

[4] See, e.g., Green v. H&R Block, Inc., 735 A.2d 1039, 1051 (Md. 1999) ("We reaffirm the rule that a principal is not liable for any physical injury caused by the negligent conduct of his agent, who is not a servant, during the performance of the principal's business, *unless the act was done in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal.*" (emphasis added)); Baldasarre v. Butler, 625 A.2d 458, 465 (N.J. 1993) (stating that "the principal is [generally] not vicariously liable for the torts of the independent contractor *if the principal did not direct or participate in them*" (emphasis added)).

[5] We expressly recognized this fact in Youngblood when we stated that "the insurance company's obligation to defend an action brought by a third person against the insured [often] contemplates that the company will take charge of the defense, including the supervision of the litigation." 895 S.W.2d at 329-30. Moreover, the various aspects of actual control exercised by the insurer over the litigation can usually be seen in the insurance contract itself, which, among other things, typically reserves for the insurer the right to select defense counsel, to guide the litigation of the
(continued...)

significant potential for conflicts of interest, it does not become invidious until the attempted control seeks, either directly or indirectly, to affect the attorney's independent professional judgment, to interfere with the attorney's unqualified duty of loyalty to the insured, or to present "a reasonable possibility of advancing an interest that would differ from that of the insured." See Tenn. Bd. of Prof'l Responsibility, Formal Op. 00-F-145 (Sept. 8, 2000). To be clear, our recognition of the control exercised by insurers in this context does not condone this practice, especially when it works to favor the interests of the insurer over that of the insured; rather, we acknowledge this aspect of the relationship only because it would be imprudent for this Court to hold that attorneys are independent contractors vis-à-vis insurers, but then to ignore the practical realities of that relationship when it causes injury.

Accordingly, we hold that an insurer can be held vicariously liable for the acts or omissions of an attorney hired to represent an insured when those acts or omissions were directed, commanded, or knowingly authorized by the insurer. This having been said, we suspect that cases in which an insurer may be held liable under an agency theory will be rare indeed. We do not hold today that an insurer may be held vicariously liable for the acts or omissions of its hired attorney based merely upon the existence of the employment relationship alone. Nor do we hold that an insurer may be held liable for any acts or omissions resulting solely from the exercise of that attorney's independent professional judgment, and in all cases, a plaintiff must show that the attorney's tortious actions were taken partly at the insurer's direction or with its knowing authorization. Nevertheless, when the insurer does undertake to exercise actual control over the actions of the insured's attorney, then it may be held vicariously liable for any harm to a plaintiff proximately caused thereby.

## B. RELATIONSHIP OF THE INSURED TO COUNSEL HIRED BY AN INSURER

The issue of whether the insured may be held vicariously liable for the tortious acts of his or her hired attorney also presents an issue of first impression in this state. In this case, McElwaney argues, similarly to Allstate, that the retained attorney stands in the role of an independent contractor vis-à-vis the insured, and that as such, the insured cannot be held vicariously liable for the tortious actions of that attorney. McElwaney further argues that, practically speaking, an insured has no right of control in this context because the insurance contract itself typically delegates many aspects of control to the insurer.

---

[5] (...continued)
claim, to control decisions regarding settlement of the claim, and perhaps most importantly, to deny coverage based on the non-cooperation of the insured. See Tenn. Bd. of Prof'l Responsibility, Formal Op. 00-F-145 (Sept. 8, 2000); Formal Op. 99-F-143 (June 14, 1999); see also 44 Am. Jur. 2d *Insurance* § 1393 (1982) (noting how the typical insurance contract gives the insurer control over the action).

Following our decision in Youngblood, no doubt can exist that the insured is the sole client of an attorney hired by an insurer pursuant to its contractual duty to defend, see 895 S.W.2d at 328,[6] and in the typical attorney-client relationship, the client maintains a significant right to control the objectives of the representation. Indeed, Ethical Consideration 7-7 states that the client retains "exclusive authority" to direct all areas of the representation that affect the merits of the cause or substantially prejudice his or her rights. See also Zagorski v. State, 983 S.W.2d 654, 658 (Tenn. 1998) ("Generally, the client has exclusive authority to make decisions about his or her case, which are binding upon the lawyer if made within the framework of the law.").

Despite the wide range of authority and right of control possessed by the client, however, the client does not have a general authority to control "the time, place, methods and means" of the representation. Importantly, Ethical Consideration 7-7 allocates to the attorney the authority to determine the specific means of achieving these objectives, and this authority is not generally subject to the control of the client. Therefore, although the line separating the sphere of client control from that of the attorney's can never be marked with the precision of a bright-line rule, there can be no question that the attorney retains substantial independent authority regarding the day-to-day aspects of the representation.

Moreover, in the unique context of insurance defense, whatever right of control the client would otherwise possess over the "time, place, methods and means" of the representation is often practically superseded by the insurance contract itself, which typically delegates much of this right of control to the insurer. Given that the insurer usually retains the right to select counsel, to guide the course of litigation, and to compel the cooperation of the insured, the insured generally has little practical authority to control the actions of his or her attorney. As the California Court of Appeals has recognized in one of the leading cases in this area,

> The assured is not in a position to exercise effective control over the lawsuit or to further his own interests by independent action, even when those interests appear in serious jeopardy. The assured may face the possibility of substantial loss[,] which can be forestalled only by action of the carrier. Thus the assured may find himself and his goods in the position of a passenger on a voyage to an unknown destination on a vessel under the exclusive management of the crew.

Merritt v. Reserve Ins. Co., 110 Cal. Rptr. 511, 519 (Cal. Ct. App. 1973). Therefore, because the client does not generally possess the right to control the "the time, place, methods and means" by which the representation is accomplished, or often even possess any right to control the objectives

---

[6] See also Tenn. Bd. of Prof'l Responsibility, Formal Op. 00-F-145 (Sept. 8, 2000) (citing Formal Op. 99-F-143 (June 14, 1999) and Formal Op. 85-F-100 (Sept. 30, 1985)).

of the representation in the insurance context, an attorney retained by an insurer must be deemed to be an independent contractor vis-à-vis the client insured.[7]

However, as we recognized above, the attorney's status as an independent contractor does not vindicate the client insured in the face of all claims of vicarious liability, because a principal can be held liable for the harm caused by the directed acts of an agent, despite whether that agent would otherwise be considered an independent contractor in the absence of such directions. Accordingly, for the reasons stated above, we hold that a client insured can also be held vicariously liable for the acts or omissions of his or her attorney when those acts or omissions were directed, commanded, or knowingly authorized by that client.

The Court of Appeals in this case held that because the law presumes an attorney to act with the authority of the client, then the client must be vicariously liable for the tortious actions of that attorney. We respectfully disagree. While the presumption regarding the apparent authority of an attorney was accurately stated by the intermediate court, its use below effectively grounds vicarious liability in tort solely on the basis of the attorney-client relationship. We conclude that this approach is too broad because it exposes the client to tort liability for virtually every action taken by the attorney during the representation, irrespective of whether the client actually directed or knowingly authorized those actions. As the Texas Court of Appeals has recognized,

> Unless a client is implicated in some way other than merely being represented by the attorney alleged to have committed the [tortious] conduct, the client cannot be liable for the attorney's conduct. A contrary holding would in effect obligate clients to monitor the actions taken by their attorneys when their attorneys are representing them, and require the clients to seize the helm of their representation at the slightest hint of [tortious] conduct. Most clients cannot possibly monitor their attorneys to the degree that would be required to meet such an obligation, and most, clearly, are not qualified for such monitoring, anyway.

Bradt v. West, 892 S.W.2d 56, 76-77 (Tex. App. 1994). We agree with this assessment, and because the basis of liability adopted by the intermediate court does not properly consider the general independent contractor status of the attorney or the unique circumstances surrounding the insurance contract itself, we decline to adopt a similar theory to impose vicarious tort liability on a client for the actions of an attorney.[8]

---

[7] Importantly, because of the insured's status as the attorney's client, the insured retains the ultimate authority to reject any directions given by the insurer to the attorney that affect the merits of the case or that affect any of the insured's substantial rights. See Tenn. Bd. of Prof'l Responsibility, Formal Op. 00-F-145 (Sept. 8, 2000). However, any such action taken by the client insured will typically be at the risk of the insurer either issuing a reservation of rights under the policy or declining to participate further in the defense or indemnification of the lawsuit. See id.

[8] The attorney, however, is always liable for his or her own torts, irrespective of whether the attorney's actions were taken within the scope of the representation or at the behest of another. As the Court of Appeals noted long ago, (continued...)

-9-

## C. DISMISSAL OF THE VICARIOUS LIABILITY CLAIMS
### PURSUANT TO RULE OF CIVIL PROCEDURE 12.02(6)

Having determined that both an insurer and an insured may, under limited circumstances, be held vicariously liable for the tortious actions of an attorney hired by the insurer to defend an insured, we must now examine the plaintiff's factual allegations contained in her complaint to determine whether she has stated a claim of vicarious liability against Allstate and McElwaney. The basis for the alleged liability of McElwaney and Allstate is found in two separate paragraphs in the complaint, which read as follows:

> 10)     The Richardson Firm, thereupon, became the attorney of record in this McElwaney damage suit for the Defendant McElwaney, and has since been, at all times material, the agent of both the Defendant McElwaney and the Defendant Allstate for whose conduct the Defendants McElwaney and Allstate are liable under the doctrine of respondeat superior.
>             . . . .
>
> 81)     The Richardson Firm was at all times material hereto acting within the scope of its employment as agent of both the Defendants McElwaney and Allstate, and the said Defendants are therefore liable for the conduct of the Richardson Firm described above under the doctrine of respondeat superior.

In no other place does the eighty-four paragraph complaint allege any relationship between the Richardson Firm and Allstate or McElwaney.

### Allegations Against Allstate

With respect to the allegations against Allstate, the paragraphs cited above seem to allege that the employment relationship alone is the basis of Allstate's alleged vicarious liability. Unlike the

---

[8] (...continued)

Neither logic nor reason permits a principal to escape liability for an act done through the medium of an agent which, if done by the principal, would have resulted in liability and, likewise, the agent cannot escape the consequences of an illegal and unauthorized invasion of the right of third persons merely upon the ground that it acted for its principal.

Fidelity & Deposit Co. v. Hamilton Nat'l Bank, 23 Tenn. App. 20, 28, 126 S.W.2d 359, 364 (1938). As such, nothing we have said in this opinion should be construed to relieve an attorney of direct liability for his or her own conduct merely because the attorney was representing another party. See also Howard v. Haven, 198 Tenn. 572, 582, 281 S.W.2d 480, 484-85 (1955) ("The authorities are abundant and need no citation to the effect that both the agent and his principal are liable for the wrongful act of the former when committed within the scope of the agent's authority, or when ratified by the principal if the act is not within the scope of such authority."); Allied Sound, Inc. v. Neely, 909 S.W.2d 815, 821 (Tenn. Ct. App. 1995) ("We note that 'an agent cannot escape liability for tortious acts, including fraud or misrepresentation, against third persons simply because the agent was acting within the scope of the agency or at the direction of the employer.'" (quoting Brungard v. Caprice Records, Inc., 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980)).

allegations of the complaint in <u>Trau-Med of America, Inc. v. Allstate Insurance Co.</u>, __ S.W.3d __ (Tenn. 2002), an opinion filed simultaneously with the opinion in this case, the complaint here contains no express allegation that Allstate directed or commanded the Richardson Firm to engage in its allegedly tortious actions.  Moreover, the plaintiff does not allege that the Richardson Firm sought and obtained Allstate's authorization for its actions.

However, as we reaffirmed in <u>White</u>, "[a] complaint 'need not contain in minute detail the facts that give rise to the claim,' so long as the complaint does 'contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial.'" 33 S.W.3d at 725 (quoting <u>Donaldson v. Donaldson</u>, 557 S.W.2d 60, 61 (Tenn. 1977)).  We believe that the other allegations of the complaint fairly raise an inference that the plaintiff intends to introduce proof that Allstate directed or knowingly authorized the Richardson Firm's actions in this case.

For example, paragraph six of the complaint alleges that Allstate originally hired a "highly competent and effective Memphis attorney" to represent its insured.  Sometime after this attorney substantially completed discovery, Allstate is alleged in paragraph nine to have fired this attorney and hired the Richardson Firm in his stead.  The Richardson Firm is then alleged to have initiated and pursued the discovery process anew with motives other than to obtain information relevant to the suit.  Taken in a light most favorable to the plaintiff, the inference fairly drawn from these allegations is that the plaintiff intends to prove that Allstate, after discharging an attorney who was competently defending its interests, directed or knowingly authorized a new firm to engage in the alleged tortious conduct to induce the plaintiff to drop her claim.

As we held above, an insurer cannot be held accountable for the actions of its attorney based merely upon the existence of the employment relationship alone; some exercise of actual control, whether it be through direction or knowing authorization, must be alleged before a complaint can be held to properly state such a claim.  However, because Allstate may reasonably infer that the plaintiff intends to prove that Allstate directed or knowingly authorized the Richardson Firm to engage in its allegedly tortious conduct, we conclude that the complaint has stated a claim of vicarious liability against Allstate.  <u>Cf.</u> <u>White</u>, 33 S.W.3d at 725.

*Allegations Against McElwaney*

With respect to the plaintiff's allegations against McElwaney, however, we must hold that the complaint does not state a claim of vicarious liability.  Again, the basis of purported liability against McElwaney is only the employment of the attorney by Allstate—a basis that, standing alone, is simply insufficient to support recovery of damages against the defendant.  In addition, the complaint does not allege facts showing that McElwaney directed the Richardson Firm to engage in its allegedly tortious actions or that the Richardson Firm sought and obtained McElwaney's knowing authorization for its course of conduct.

Moreover, unlike our analysis of the complaint regarding Allstate's purported liability, we

-11-

do not find that the complaint's allegations fairly raise an inference that McElwaney in any way directed or knowingly authorized the actions of the Richardson Firm. To the contrary, the fair inference drawn from the plaintiff's allegations is that McElwaney had no control or influence over the actions of the Richardson Firm. For example, the complaint alleges that McElwaney had no real financial stake in the determination of the original suit—the plaintiff alleges that she offered to settle the suit within McElwaney's policy limits—and that he therefore possessed little motive to control or direct the representation to avoid an adverse judgment. Furthermore, the complaint alleges that Allstate, not McElwaney, had the power to employ and discharge counsel. As such, it appears that the only basis of liability as far as McElwaney is concerned is that of the attorney-client relationship.

Accordingly, because the complaint does not allege facts showing that McElwaney directed, commanded, or knowingly authorized the Richardson Firm to engage in its allegedly tortious conduct—an essential element for vicarious liability in this context—we hold that the plaintiff has not stated a claim against McElwaney upon which she may be granted relief. Cf. Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., 986 S.W.2d 550, 556 (Tenn. 1999) (dismissing complaint for failure to state a claim where the complaint did not allege facts supporting an essential element of the claim). We therefore dismiss the plaintiff's claims of vicarious liability against McElwaney.

## II. ALLEGATIONS OF SUBSTANTIVE LIABILITY

Having determined that the complaint alleges a proper basis to hold Allstate vicariously liable for the actions of the Richardson Firm, we must now determine whether the complaint alleges sufficient facts that, if proven, would constitute tortious conduct by the Richardson Firm. The plaintiff has alleged four separate causes of action, including abuse of process, inducement to breach express and implied contracts of confidentiality, inducement to breach a confidential relationship, and invasion of privacy. The trial court found that the complaint sufficiently stated a claim for relief under all four theories, but the Court of Appeals dismissed the claims for inducement to breach a confidential relationship and for invasion of privacy.

Before this Court, Allstate has appealed the ruling of the intermediate court with respect to the claims of abuse of process and of inducement to breach express and implied contracts of confidentiality. The plaintiff has also questioned whether the Court of Appeals properly dismissed her claims of inducement to breach a confidential relationship and invasion of privacy. Consequently, all four of the plaintiff's original claims are now before this Court, and we discuss each of them individually below.

### A. ABUSE OF PROCESS

The plaintiff first asserts that the allegedly abusive actions of the Richardson Firm in conducting discovery constituted an abuse of process, a tort for which we have long recognized a remedy. See Priest v. Union Agency, 174 Tenn. 304, 125 S.W.2d 142 (1939). As this Court has acknowledged, "'the gist of the tort is not commencing an action or causing process to issue without

justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish.'" Bell ex rel. Snyder, 986 S.W.2d at 555 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 121, at 897 (5th ed. 1984)). To this end, a plaintiff must establish by evidence two elements to recover for abuse of process: "'(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" Id. (quoting Priest, 174 Tenn. at 307, 125 S.W.2d at 143); see also Donaldson, 557 S.W.2d at 62.

The test as to whether process has been abused is "whether the process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do." Priest, 174 Tenn. at 307, 125 S.W.2d at 143-44. In its most basic sense, therefore, an action for abuse of process is intended to prevent parties from using litigation to pursue objectives other than those claimed in the suit, such as using a court's process as a weapon "to compel [another party] to pay a different debt or to take some action or refrain from it." *Restatement (Second) of Torts* § 682 cmt. b (1977). It is the use of process to obtain this "collateral goal"—a result that the process itself was not intended to obtain—that is the very heart of this tort. The essential question to be answered concerning the present claim, therefore, is whether the use of process to discourage the other party from continuing the litigation is a sufficiently "collateral goal" to give rise to tort liability.

Ordinarily, the lawful use of a court's process does not give rise to an abuse of process claim, and no claim of abuse will be heard if process is used for its lawful purpose, even though it is accompanied with an incidental spiteful motive or awareness that the use of process will result in increased burdens and expenses to the other party. Id. However, a different case is presented when the *primary* purpose of using the court's process is for spite or other ulterior motive. For example, in Nienstedt v. Wetzel, 651 P.2d 876, 882 (Ariz. Ct. App. 1982), the Arizona Court of Appeals held that while "there is no liability when the defendant has done nothing more than legitimately utilize the process for its authorized purposes, even though with bad intentions," an action for abuse of process may lie where "the ulterior or collateral purpose involved [is] to expose the injured party to excessive attorney's fees and legal expenses." In this respect, the court held that an action for abuse of process is proper where the plaintiff can establish that such was the primary motive for the discovery tactics and where the plaintiff can show that the "use of various legal processes was not for [the] legitimate or reasonably justifiable purposes of advancing [the party's] interests in the ongoing litigation." Id. Importantly, the Nienstedt Court was clear that mere awareness of the additional costs and burdens would not warrant liability; instead, the court stated that "[l]iability should result only when the sense of awareness progresses to a sense of purpose . . . ." Id.

Other courts have also recognized that a primary desire to harass and cause unnecessary expense to the other party in litigation is a sufficient ulterior motive to constitute an abuse of process. The New York Court of Appeals, for example, found that a claim for abuse of process was stated when a complaint alleged that defendants used regularly issued subpoenas to harass and inflict economic injury upon the plaintiffs. See Board of Educ. v. Farmingdale Classroom Teachers' Ass'n,

Inc., 343 N.E.2d 278, 283 (N.Y. 1975). Noting that "when a party abuses process[,] his tortious conduct injures not only the intended target but offends the spirit of the legal procedure itself," id. at 281, the court further stated that

> [w]hile it is true that public policy mandates free access to the courts for redress of wrongs and our adversarial system cannot function without zealous advocacy, it is also true that legal procedure must be utilized in a manner consonant with the purpose for which that procedure was designed. Where process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party.

Id. at 283 (citations omitted). Moreover, in Vallance v. Brewbaker, 411 N.W.2d 808, 646 (Mich. Ct. App. 1987), the Michigan Court of Appeals recognized in *dicta* that allegations of the use of discovery "in a manner consistent with the rules of procedure, but for the improper purpose of imposing an added burden and expense on the opposing party in an effort to conclude the litigation on favorable terms," can form the basis of a valid abuse of process claim.

Broadly speaking, the aim of the civil discovery process is "to bring out the facts prior to trial so the parties will be better equipped to decide what is actually at issue," see, e.g., Ingram v. Phillips, 684 S.W.2d 954, 958 (Tenn. Ct. App. 1984), not to wear the mettle of the opposing party to reach a favorable termination of the cause unrelated to its merits. When the civil discovery procedures are used with the specific and malicious intent to weaken the resolve of the other party, then one may rightfully claim that the procedures are being used "to accomplish some end which is without the regular purview of the process." Accordingly, we adopt the test first announced in Nienstedt and hold that abuse of process in the civil discovery context may lie when (1) the party who employs the process of a court specifically and *primarily* intends to increase the burden and expense of litigation to the other side; and (2) the use of that process cannot otherwise be said to be for the "legitimate or reasonably justifiable purposes of advancing [the party's] interests in the ongoing litigation."

In this case, we conclude that the plaintiff's complaint states a claim for abuse of process in the Richardson Firm's use of discovery subpoenas, depositions, and interrogatories. The plaintiff has in fact alleged the ulterior motive for the practices of the Richardson Firm in paragraph seventy-four of her complaint, which states that the Richardson Firm used the discovery process "for the improper purposes of (1) harassing the Plaintiff; and (2) causing the Plaintiff to incur unnecessary expense to defend against its discovery schemes; [and] (3) weakening the Plaintiff's resolve to pursue the suit to the extent that she will abandon it." Cf. Nienstedt, 651 P.2d at 882. Taken as true, these allegations certainly support the first element of the tort, *i.e.*, the existence of an ulterior motive.

Regarding the second element of the tort, an act "in the use of process other than such as would be proper in the regular prosecution of the charge," we find that the complaint alleges facts showing that the Richardson Firm issued process without any reasonably justifiable purpose of advancing its legitimate interests in the ongoing litigation. For example, the complaint alleges that

-14-

the Richardson Firm issued more than 230 interrogatories and subjected her to an eight-hour deposition, even though much of the information requested in the interrogatories and deposition was either already in the defendant's possession, not relevant to the issues in litigation, or otherwise not reasonably calculated to lead to discoverable information. The plaintiff has also alleged that the Richardson Firm issued more than seventy discovery subpoenas for medical and other records to obtain embarrassing information not related to the issues in the case and to obtain confidential and privileged information about the plaintiff from the plaintiff's psychologist. Taking these allegations as true, we find that the complaint has sufficiently alleged a use of process for purposes other than would be proper "in the regular prosecution of the charge."

In response, Allstate advances two primary arguments. First, it argues that the Richardson Firm used the interrogatories and subpoenas solely for their lawful and intended purpose of gathering information relating to the merits of the case. This may in fact be so, but the intention of the Richardson Firm is a question of fact not properly decided in a motion to dismiss under Rule 12.02(6). In deciding whether to grant a motion to dismiss, this Court does not look to the perceived strength of the plaintiff's proof. See, e.g., White, 33 S.W.3d at 718. Rather, we look only to the allegations contained in the plaintiff's complaint, and we find here that the complaint sufficiently alleges that the Richardson Firm primarily sought to increase the burden and expense of litigation to the plaintiff.

Second, Allstate argues that before a claim for abuse of process can be stated, the complaint must allege that the Richardson Firm took some action *after* it issued the subpoenas which shows an improper use of process. We disagree. Although some cases contain language that initially appears to support Allstate's position, see Bell ex rel. Snyder, 986 S.W.2d at 555, we believe that Allstate has read these cases too broadly. Instead, the additional use requirement only demands that a plaintiff show some additional abuse of process after the *original* processes of the court, *i.e.*, the complaint, summons, and responsive pleadings, have been issued. In fact, the additional use requirement must be so limited because it is this requirement alone that distinguishes this tort from that of malicious prosecution, which arises solely upon the filing of a complaint without probable cause. See Roberts v. Federal Express Corp., 842 S.W.2d 246, 247-48 (Tenn. 1992).

Once a suit has been filed and other processes have been unjustifiably issued, a plaintiff is not then also required to show some further misuse of that process to state a claim for relief. As the New Mexico Supreme Court has recognized,

> While a subsequent act may suffice to prove an abuse of process which was appropriate when issued, it is not an essential element. The initial use of process itself may constitute the required overt act under the facts. . . . We thus are in agreement with the court in Mills [County State Bank v. Roure, 291 N.W.2d 1, 5 (Iowa 1980)], when it wrote:
>
>> The existence of this cause of action recognizes that even in meritorious cases the legal process may be abused. That abuse

-15-

involves using the process to secure a purpose for which it was not intended. We can see no reason why there must be subsequent activity to support the cause of action. Such activity may be very probative in determining the intent to abuse; however, there need not be such a subsequent action to commit the tort. *To rule otherwise would protect the tortfeasor when the abuse is most effective—where the issuance of the process alone is sufficient to accomplish the collateral purpose.*

Richardson v. Rutherford, 787 P.2d 414, 421 (N.M. 1990) (citations omitted) (emphasis added). We conclude, therefore, that the plaintiff has adequately alleged facts supporting both elements of a claim for tortious abuse of process.

*Plaintiff's Waiver of Her Abuse of Process Claim*

The Court of Appeals held that the plaintiff waived her right to complain of abuse of process in this case by failing to object to the questions posed by the interrogatories and by failing to object to questions in her second deposition. To be certain, this issue is clearly present, along with an issue as to whether the plaintiff acted appropriately to mitigate her own damages. Nothing we have said today operates to relieve parties of any responsibility to preserve rights or to take reasonable steps to mitigate their own damages from such abuses. Cf. Southeastern Greyhound Lines, Inc. v. Groves, 175 Tenn. 584, 594, 136 S.W.2d 512, 516 (1940) ("[I]t is [a plaintiff's] duty to see that as little injury follows the act as possible, and if by ordinary care a particular injury may be avoided, [the plaintiff] cannot hold the wrongdoer responsible."); Ceramic Tile Distribs., Inc. v. Western Express, Inc., 40 S.W.3d 56, 59 (Tenn. Ct. App. 2000).[9]

However, despite the possibility that the plaintiff may have waived any right to complain of abuse of process or that she may have failed to take reasonable steps to mitigate her claimed damages, we are hesitant to dismiss her complaint based upon the potential existence of a factual affirmative defense. In Anthony v. Tidwell, 560 S.W.2d 908, 909 (Tenn. 1977), we held that a "complaint is subject to dismissal under rule 12.02(6) for failure to state a claim if an affirmative defense clearly and unequivocally appears on the face of the complaint." We also noted that "[i]t is not necessary for the defendant to submit evidence in support of his motion when the facts on which he relies to defeat plaintiff's claim are admitted by the plaintiff in his complaint." Therefore, when the affirmative defense involves only an issue of law, such as whether the statute of limitations has run, see Tidwell, 560 S.W.2d at 909; Dukes v. Noe, 856 S.W.2d 403, 404 & n.1 (Tenn. Ct. App. 1993), application of this standard is certainly appropriate.

Nevertheless, when the affirmative defense relates primarily to an issue of fact, different concerns may often counsel against deciding the merits of the affirmative defense in a motion to

---

[9] Indeed, we note that in the pre-trial discovery context, one method of mitigating these types of damages is to seek a protection order from the court pursuant to Rule of Civil Procedure 26.03.

dismiss. First, the liberal pleading requirements of Rule of Civil Procedure 8.01 require a plaintiff only to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." See White, 33 S.W.3d at 718. As one commentator has noted, the very purpose of Rule 8.01 is defeated if a plaintiff must plead facts not strictly related to the prima facie claim solely "to anticipate matters that may be set up as affirmative defenses." See Rhynette Northcross Hurd, The Propriety of Permitting Affirmative Defenses to be Raised by Motions to Dismiss, 20 Univ. Mem. L. Rev. 411, 415 (1990). Second, and more importantly, a court resolving a factual dispute only upon the complaint's allegations may not fully consider whether other evidence exists that defeats or mitigates the apparent defense. Consequently, an injustice may occur if a court dismisses a complaint on a factual affirmative defense merely because no rebuttal of that defense appears within the complaint's allegations. Id.

Accordingly, we conclude that the more appropriate course of action in this case is to permit the suit to continue so that the validity of these factual affirmative defenses may be tested by actual proof and not merely upon the potentially incomplete allegations of the complaint. Again, we are not concerned with whether the plaintiff will ultimately prevail in her action, and we seek only to determine whether her allegations, if proven, would establish a prima facie case of liability. See White, 33 S.W.3d at 718. We hold that they would and that the resolution of any factual affirmative defenses should be made by the trial court only upon complete consideration of all the surrounding facts and circumstances.

## B. INDUCEMENT TO BREACH EXPRESS AND IMPLIED CONTRACTS OF CONFIDENTIALITY

The plaintiff next alleges that her physician was bound by express and implied contracts to keep her medical information confidential and that the Richardson Firm, in its efforts to obtain this information, induced him to breach these contracts of confidentiality. More specifically, the plaintiff alleges that the Richardson Firm is liable for inducement to breach contracts of confidentiality by requesting medical records through the use of defective subpoenas and by initiating private conversations with her physician and other health care providers outside a formal deposition.

Tennessee recognizes both a statutory and common law action for inducement to breach a contract, see Tenn. Code Ann. § 47-50-109 (2001); Polk & Sullivan, Inc. v. United Cities Gas Co., 783 S.W.2d 538, 543 (Tenn. 1989), and both forms of the action protect "contracts implied in fact, as well as formal, expressed contracts," Mefford v. City of Dupontonia, 49 Tenn. App. 349, 355, 354 S.W.2d 823, 826 (1961). Importantly, the elements for both forms of the action are identical, except that a plaintiff asserting a common law action may recover punitive damages, instead of the treble damages mandated by the statute. See Buddy Lee Attractions, Inc. v. William Morris Agency, Inc., 13 S.W.3d 343, 360-61 (Tenn. Ct. App. 1999). In order to recover on a theory of inducement to breach a contract, a plaintiff must allege and prove seven elements: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured

the plaintiff.  See Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 822 (Tenn. 1994); Baker v. Hooper, 50 S.W.3d 463, 468 (Tenn. Ct. App. 2001).

*Inducement to Breach an Express Contract of Confidentiality*

As to her allegations of inducement to breach an express contract of confidentiality, the plaintiff alleges that an express contract of confidentiality was created when the plaintiff's physician required her to execute a written waiver of confidentiality before sending her medical records to her own attorney.  The parties raise substantial issues of Allstate's awareness of this alleged contract and of its intent to induce its breach.  Our review of the complaint, however, raises an even more fundamental issue: whether the allegations of the complaint plead an express contract of confidentiality or merely a physician's gratuitous promise of confidentiality.

As claimed in the complaint, the alleged express contract of confidentiality was not part of the original contract of treatment for compensation.  Rather, the physician requested the written authorization that forms the basis of this alleged contract only after the plaintiff had been treated and later retained counsel.  As such, an issue arises whether this alleged agreement is a new agreement or merely an addition or modification of the existing treatment contract between the plaintiff and her physician.  Drawing the inference in favor of the plaintiff, as the law requires us to do when reviewing a motion to dismiss, see McClenahan v. Cooley, 806 S.W.2d 767, 769 (Tenn. 1991), we will presume that this new agreement is merely a modification of the earlier contract.

The law in Tennessee is clear that the "modification of an existing agreement which imposes new obligations on one of the parties is unenforceable for lack of consideration unless it also imposes a new obligation on the other party."  Dunlop Tire & Rubber Corp. v. Service Merch. Co., 667 S.W.2d 754, 759 (Tenn. Ct. App. 1983); see also Boyd v. McCarty, 142 Tenn. 670, 676, 222 S.W. 528, 530-31 (1920).  Indeed, "[p]erforming what was already promised in the original contract is not consideration to support a second contract."  Dunlop Tire & Rubber Corp., 667 S.W.2d at 759 (citing American Fruit Growers, Inc. v. Hawkinson, 21 Tenn. App. 127, 134, 106 S.W.2d 564, 568 (1937)).  As such, to state a claim showing the existence of an enforceable contract in this regard, the complaint must allege facts showing that the plaintiff offered additional consideration to support the physician's new and express promise to keep her records confidential.

However, upon our review of the complaint in this case, we do not find any facts alleging that this promise of confidentiality was supported by additional consideration, nor do we find that the facts as alleged lead to a reasonable *inference* that the promise was supported by consideration.  For example, the complaint does not allege that the plaintiff, in exchange for this new express promise of confidentiality, agreed to undertake additional obligations for the benefit of her physician or that she agreed to forbear from doing anything that she previously had a lawful right to do.  See Brown Oil Co. v. Johnson, 689 S.W.2d 149, 151 (Tenn. 1985) ("It is well-settled that consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do.").  Moreover, the complaint does not allege, nor are we able to infer, that the parties originally intended for the express promise of confidentiality to be part

of the original contract of treatment for compensation, but that it was omitted from any express contract by some oversight. Cf. Wright v. Fischer, 24 Tenn. App. 650, 658, 148 S.W.2d 49, 53 (1940).

Although the Court of Appeals held that the plaintiff sufficiently pleaded the existence of an express contract, we respectfully disagree. We are required to "liberally construe the complaint in favor of the plaintiff when considering a motion to dismiss for failure to state a claim," see, e.g., White, 33 S.W.3d at 718 (citation omitted), but we are not permitted to "create a claim that the pleader does not spell out in his complaint," Donaldson, 557 S.W.2d at 62; see also Rampy v. ICI Acrylics, Inc., 898 S.W.2d 196, 198 (Tenn. Ct. App. 1994) ("It is inappropriate for the court to create a claim where none exists."). As such, the mere legal conclusion that a contract exists will not be sufficient to withstand a motion to dismiss, unless factual allegations support that conclusion directly or by necessary inference. See White, 33 S.W.3d at 718 (stating that "allegations of pure legal conclusions will not sustain a complaint"). Accordingly, because the complaint does not allege facts showing the existence of an enforceable express contract supported by adequate and sufficient consideration, we hold that the plaintiff has not stated a claim against Allstate for inducement to breach an express contract of confidentiality.

*Inducement to Breach an Implied Contract of Confidentiality*

As to the plaintiff's allegations of inducement to breach an implied contract of confidentiality, her complaint alleges that such a contract was created when she agreed to pay money in return for medical treatment. She further alleges that this implied contract arose from the specific understanding and actions of the parties that her medical information would remain confidential. Accordingly, we must examine the complaint's allegations to determine whether facts have been sufficiently plead to support the various elements of this tort.

a. The Existence of an Implied Contract of Confidentiality

A contract implied in fact is one that "arise[s] under circumstances which show mutual intent or assent to contract." Angus v. City of Jackson, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1997). Such a contract or agreement "may result as a legal inference from the facts and circumstances of the case," Paschall's, Inc. v. Dozier, 219 Tenn. 45, 53, 407 S.W.2d 150, 154 (1966), but to be enforceable, the implied contract must nevertheless be supported by mutual assent, consideration, and lawful purpose. See Johnson v. Central Nat'l Ins. Co., 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (1962) (recognizing that an implied contract "must result from a meeting of the minds of the parties in mutual assent to the terms, [and] must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced"); Lay v. Fairfield Dev., 929 S.W.2d 352, 356 (Tenn. Ct. App. 1996) (same).

Although we have yet to decide a case where an implied contract of confidentiality arose between a physician and a patient, we have recognized that such a possibility exists when a patient compensates a physician in return for medical treatment. See Quarles v. Sutherland, 215 Tenn. 651,

657, 389 S.W.2d 249, 252 (1965).  Since our decision in Quarles, however, the General Assembly has enacted several statutes that expressly require a physician and others to keep a patient's medical records and identifying information confidential.  See Tenn. Code Ann. §§ 63-2-101(b)(1) (1997); 68-11-1502 (2001); 68-11-1503 (2001).  Through the enactment of these statutes, patients and physicians now clearly expect that the physician will keep the patient's information confidential, and this expectation arises at the time that the patient seeks treatment.  As one of the leading cases recognizing implied covenants of confidentiality in this context has acknowledged,

> Any time a doctor undertakes the treatment of a patient, and the consensual relationship of physician and patient is established, two jural obligations (of significance here) are simultaneously assumed by the doctor.  Doctor and patient enter into a simple contract, the patient hoping that he will be cured and the doctor optimistically assuming that he will be compensated.  As an implied condition of that contract, this Court is of the opinion that the doctor warrants that any confidential information gained through the relationship will not be released without the patient's permission. . . .  Consequently, when a doctor breaches his duty of secrecy, he is in violation of part of his obligations under the contract.

Hammonds v. Aetna Cas. & Sur. Co., 243 F. Supp. 793, 801 (N.D. Ohio 1965).  As such, we now expressly hold that an implied covenant of confidentiality can arise from the original contract of treatment for payment, and we find that the plaintiff's complaint here has adequately alleged the existence of an implied covenant of confidentiality.

### b.  Breach of Implied Covenant of Confidentiality Based Upon the Physician's *Response to Subpoenas*

Having found the existence of an implied covenant of confidentiality, we must next examine whether the complaint has alleged a breach of this implied covenant.  Initially, it is clear that whatever the terms of this implied covenant of confidentiality may be, a physician cannot withhold such information in the face of a subpoena or other request cloaked with the authority of the court.  Undoubtedly, any such contract would be contrary to public policy as expressed in the rules governing pre-trial discovery and in the relevant medical confidentiality statutes.[10]

Nevertheless, the plaintiff would have us declare that a physician does have a duty to keep a patient's information confidential in the face of a technically defective subpoena.  We agree that the subpoenas issued by the Richardson Firm without the plaintiff's agreement did not strictly comply with the requirements of Rule of Civil Procedure 45.07.  However, we do not agree that a physician is under a duty to discover technical defects in a subpoena, or to submit a subpoena for

---

[10]  See Tenn. Code Ann. § 63-2-101(b)(1) (1997); Tenn. Code Ann. § 68-11-304(a)(1) (2001); Tenn. Code Ann. § 68-11-1505 (2001).  These statutes, of course, do nothing to change the common law of Tennessee, which does not recognize the existence of a testimonial privilege between a physician and patient.  See Quarles, 215 Tenn. at 657, 389 S.W.2d at 252.

legal review and evaluation, before releasing a patient's medical records.  Instead, the law can only require a physician responding to such request to act in good faith and with a subjective belief as to the validity of that request.  Consequently, unless a plaintiff can show that a physician acted in bad faith or with actual knowledge of the subpoena's invalidity, no breach of an implied covenant of confidentiality can occur in this context.[11]

Using this standard as our guide, we find that the plaintiff has not alleged sufficient facts showing that her physician actually breached his implied covenant of confidentiality by releasing records pursuant to a technically defective subpoena.  For example, we find no allegation that the physician acted in bad faith in sending the plaintiff's medical records to the Richardson Firm or that he was actually aware that the subpoenas did not meet the technical requirements of the law. Without these averments, therefore, we must hold that the plaintiff has not stated a claim that the Richardson Firm, in requesting medical records through subpoena, induced her physician to breach his implied covenant of confidentiality.

### c. Breach of Implied Covenant of Confidentiality Based upon the Physician's *Private Conversations* with Opposing Counsel

A much different case is presented, however, with respect to whether the physician breached his implied covenant of confidentiality by informally speaking to members of the Richardson Firm about the plaintiff's medical information.  While the understanding of the parties giving rise to the implied covenant of confidentiality permits a physician to disclose information pursuant to subpoena or court order, this understanding does not include permission to divulge this information informally without the patient's consent.[12]  Therefore, absent circumstances giving rise to a duty to warn identifiable third persons against foreseeable risks emanating from a patient's illness, see Bradshaw v. Daniel, 854 S.W.2d 865, 872 (Tenn. 1993), we hold that a physician breaches his or her implied covenant of confidentiality by divulging medical information, without the patient's consent, through informal conversations with others.  Accordingly, we find that the complaint in this case alleges sufficient facts showing that the physician breached his implied covenant of confidentiality by informally speaking to the Richardson Firm about the plaintiff's condition without her consent.[13]

---

[11] This is not to say that a party is without any recourse against a technically defective subpoena seeking medical records or that parties are free to obtain discoverable information by any means possible without regard to proper processes or procedures.  Rather, we conclude that the authority given to trial courts by the Rules of Civil Procedure to regulate the discovery process is adequate to deal with such technical deficiencies in the method of discovery.  See Tenn. R. Civ. P. 26.03; 37.01(4).

[12] The physician's statutory duty of confidentiality is subject to several limited exceptions, see Tenn. Code Ann. §§ 63-2-101(b)(1); 68-11-1503, but no exception permits disclosure of medical information in private conversations without the patient's consent.  As such, we are not inclined to find that patients or physicians typically expect that the physician's implied covenant of confidentiality contains an "informal interview" exception.

[13] Allstate argues that Alessio v. Crook, 633 S.W.2d 770, 780 (Tenn. Ct. App. 1982), permits informal interviews of physicians without the patient's consent, and as such, attorneys cannot be guilty of inducing a breach of
(continued...)

### d. Damages Resulting from the Physician's Private Conversations with Opposing Counsel

Having found sufficient allegations concerning the existence and breach of an implied contract of confidentiality, and presuming, but not deciding, that facts are pled showing the elements of knowledge, intent, and malice, we must examine whether the plaintiff has alleged facts showing that she has suffered damage from this breach. The plaintiff claims that as a result of these informal conversations between the Richardson Firm and her physician, she has suffered a "strategic loss" in the litigation. More specifically, she alleges that the Richardson Firm "was free to explore Dr. Holcomb's thoughts with impunity until he revealed something favorable to them, which could then be inquired about in a deposition unencumbered with a lot of unfavorable testimony." No other allegations of injury arising out of these informal conversations are present.[14]

No case in Tennessee has previously recognized that, as a matter of law, a party may claim injury based on a "strategic loss" in pre-trial litigation, and we decline to recognize such a possibility here. Quite simply, if the plaintiff was concerned that testimony unfavorable to the defendant was not adequately disclosed in the deposition of her physician, then her remedy was to prepare an examination of the physician herself, thereby ensuring a complete record for trial. Because the complaint alleges no legally cognizable injury resulting from these informal conversations with the plaintiff's physician, we must find that she has not stated a claim that the Richardson Firm, by initiating informal and private conversations with her physician, induced him to breach his implied covenant of confidentiality.

### C. INDUCEMENT TO BREACH A CONFIDENTIAL RELATIONSHIP

The plaintiff next alleges that the Richardson Firm, by obtaining her medical information with defective subpoenas and through private conversations with her physician, induced him to breach his confidential relationship with her. Because confidential relationships in Tennessee can assume a variety of forms, a unifying principle connecting all such relationships is difficult to establish. Nevertheless, prior cases make it clear that a confidential relationship is not one merely exhibiting mutual trust and confidence. Rather, the relationship is more accurately described as one

---

[13] (...continued)
an implied covenant of confidentiality by merely requesting such an interview. We disagree. Although Alessio does contain *dicta* to support Allstate's argument, that case was decided prior to the enactment of Tennessee Code Annotated section 63-2-101 and the Patient's Privacy Protection Act. After the enactment of these statutes, patients and physicians now generally expect that the physician will keep the patient's medical information confidential, subject to a duty to disclose imposed by law. Consequently, any statements in Alessio that permit counsel to informally interview a physician without the patient's consent no longer accurately reflect the law in this area.

[14] The plaintiff does allege elsewhere that she suffered "great embarrassment, anger and stress over the knowledge that the details of her most intimate revelations to all of her many healthcare professionals have been made public by the conduct of the Richardson Firm." However, these claims precede her allegations that the Richardson Firm induced a breach of her physician's implied covenant of confidentiality by initiating private conversations, and they seem to relate only to her claims of inducement based upon the defective subpoenas.

in which "'confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.'" Mitchell v. Smith, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) (quoting Iacometti v. Frassinelli, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)).

This Court has long recognized that an abuse or breach of a confidential relationship to gain a benefit or advantage will give rise to an action for damages. See Leake v. Gray, Shillinglaw & Co., 189 Tenn. 574, 592, 226 S.W.2d 298, 305 (1949). As we stated in Turner v. Leathers, 191 Tenn. 292, 298, 232 S.W.2d 269, 271 (1950),

> Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation had existed.

(internal quotations omitted). To be clear, then, a plaintiff may recover damages from an abuse or breach of a confidential relationship only by showing that (1) the defendant was in a position to influence or control the plaintiff; (2) the defendant used the confidences given to him or her to obtain some benefit from, or advantage over, the plaintiff; and (3) the plaintiff, as the dominated party in the relationship, suffered some detriment at the hands of the defendant. See Mahunda v. Thomas, 55 Tenn. App. 470, 478, 402 S.W.2d 485, 489 (1965) (citing Peoples Bank v. Baxter, 41 Tenn. App. 710, 720-21, 298 S.W.2d 732, 737 (1956)); see also Kelly v. Allen, 558 S.W.2d 845, 848 (Tenn. 1977) (stating that "there must be a showing that there were present the elements of dominion and control by the stronger over the weaker").

In reviewing the complaint in this case, we find that the plaintiff has not stated a claim for inducement to breach a confidential relationship. While the physician-patient relationship can constitute such a relationship, see Shadrick v. Coker, 963 S.W.2d 726, 735-36 (Tenn. 1998); Turner, 191 Tenn. at 298, 232 S.W.2d at 271, the plaintiff has not alleged that her physician used the trust or confidences given to him either to obtain an advantage over her or to extract some benefit from her. Clearly, a physician's revealing of confidences is not tantamount to a tortious breach of a confidential relationship—at least as that tort has been previously recognized in this state—unless that physician also uses the confidences given to him or her to obtain some benefit from, or advantage over, the patient.[15] Because the complaint here does not allege that the Richardson Firm induced her physician to obtain any benefit or advantage for himself, we must therefore find that the

---

[15] We acknowledge that the plaintiff has alleged that the Richardson Firm obtained an advantage by inducing her physician to reveal information. However, because the plaintiff does not have a confidential relationship with the Richardson Firm, the complaint must allege that the Richardson Firm induced the plaintiff's physician to obtain an advantage or benefit for himself by abusing the confidence placed in him by the plaintiff. See Mitchell, 779 S.W.2d at 389.

complaint fails to state a claim for inducement to abuse or breach a confidential relationship. We affirm the judgment of the Court of Appeals on this issue.

## D. INVASION OF PRIVACY

Finally, the plaintiff asserts that the Court of Appeals erred in dismissing her invasion of privacy claims. The complaint alleges that the Richardson Firm invaded her common law right of privacy by obtaining her medical information with defective subpoenas and that it invaded her right of privacy under the Patient's Privacy Protection Act, Tenn. Code Ann. §§ 68-11-1501 to -1505 (2001), by having informal conversations with her physician without her consent. We address each of these claims separately.

### Common Law Invasion of Privacy

With the exception of an action for false light invasion of privacy, see West v. Media Gen. Convergence, Inc., 53 S.W.3d 640 (Tenn. 2001), this Court has never expressly recognized that a cause of action exists for an invasion of privacy, though we have assumed that Tennessee law recognizes such an action in at least two cases, see Martin v. Senators, Inc., 220 Tenn. 465, 418 S.W.2d 660 (1967); Langford v. Vanderbilt Univ., 199 Tenn. 389, 287 S.W.2d 32 (1956). The Court of Appeals, on the other hand, has recognized that an unreasonable intrusion upon the seclusion of another is actionable in this state and that the scope of this tort is parallel to that contained in section 652B of the *Restatement (Second) of Torts*. See Roberts v. Essex Microtel Assocs., II, L.P., 46 S.W.3d 205, 211 (Tenn. Ct. App. 2001). Although we reach no decision as to whether the other forms of invasion of privacy listed in the *Restatement (Second) of Torts* are actionable—the plaintiff's complaint does not raise issues related to commercial appropriation or unreasonable publicity—we agree with the Court of Appeals that a plaintiff may recover damages in Tennessee for an unreasonable intrusion into his or her private affairs.

As the Roberts Court held, "'One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.'" See id. at 211-12 (quoting *Restatement (Second) of Torts* § 652B). No especial publicity needs to be given to the plaintiff or to the plaintiff's affairs, and a cause of action may be stated where the plaintiff shows an intentional, and objectively offensive, interference with his or her interest in solitude or seclusion. See *Restatement (Second) of Torts* § 652B cmt. a. Further, as comment *c* to section 652B provides,

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection.

The essential question to be answered with respect to this issue, then, is whether the complaint has pled facts showing that the Richardson Firm "invaded a private seclusion that the plaintiff has thrown about [her] person or affairs." Because a plaintiff cannot seek damages for intrusion into seclusion when he or she is required to make the allegedly private information available for public inspection, a plaintiff must allege and prove the following essential elements: (1) that the information sought by the opposing party was not properly discoverable or was otherwise subject to some form of privilege; (2) that the opposing party knew that the information was not discoverable or was subject to privilege, but nevertheless proceeded to obtain that information; (3) that the obtaining of such information would be highly offensive to a reasonable person; and (4) that injury was suffered from the invasion of privacy.

The plaintiff here alleges none of these elements in her complaint, and she concedes that the *substance* of her medical information became discoverable, and subject to public disclosure, as soon as she filed a complaint seeking damages for physical injuries. However, no successful claim for invasion of privacy can rest only upon the technical defects in the process used to obtain that information, and a plaintiff must aver and prove that the defendant tried to obtain information that it knew was non-discoverable or subject to privilege. Therefore, because the plaintiff concedes that her medical information here was discoverable, we must hold that the plaintiff has failed to state a claim for common law invasion of privacy by intrusion into seclusion.

### *Privacy Rights under the Patient's Privacy Protection Act*

The plaintiff also alleges that the Richardson Firm violated her privacy rights under the Patient's Privacy Protection Act by having informal conversations with her physician outside a deposition. The Patient's Privacy Protection Act recognizes that all patients entering and receiving care at a licensed health care facility have "the expectation of and right to privacy for care received at such facility." See Tenn. Code Ann. § 68-11-1503. To this end, section 68-11-1503 prohibits the divulging of a patient's "name and address and other identifying information," subject to four express exceptions. However, disclosing a patient's identifying information in response to a subpoena does not violate the Act. See Tenn. Code Ann. § 68-11-1505.[16]

Upon review of the plaintiff's allegations, we conclude that the plaintiff has not stated a claim against Allstate under the Patient's Privacy Protection Act. The plain language of the Act provides a cause of action only for the *divulging* of protected information, not for the requesting or the obtaining of such information. By restricting the statute's application only to those who divulge a patient's identifying information, the General Assembly did not create a statutory action for the *inducement* to divulge identifying information. Therefore, because we will not construe statutory language to unduly expand it beyond its plain and obvious import, see Limbaugh v. Coffee Med.

---

[16] To the extent that the plaintiff's claims under this Act are for the divulging of non-identifying medical information, they may not fall within the scope of these statutes. See Tenn. Code Ann. § 68-11-1503 (prohibiting only the divulging of a patient's "name and address and other identifying information"). Nevertheless, because her claims under the Act fail on other grounds, we need not comment further on this issue. We also find it unnecessary to address whether a technically defective subpoena falls within the statutory exception contained in section 68-11-1505.

Ctr., 59 S.W.3d 73, 83 (Tenn. 2001), we hold that the statutory action established by section 68-11-1504 is available only against those persons who (1) have a statutory duty to keep identifying information confidential, and (2) actually divulge that information to parties not falling within a statutory exception. Accordingly, because the plaintiff here has not brought suit directly against her physician or other healthcare providers for divulging her identifying information, we must affirm the judgment of the Court of Appeals that the complaint does not state a claim for an invasion of privacy under the Patient's Privacy Protection Act.

## CONCLUSION

In summary, we hold that neither an insurer nor an insured may be held vicariously liable for the tortious acts or omissions of an attorney hired to defend the insured, unless the attorney's alleged tortious actions were directed, commanded, or knowingly authorized by the insurer or the insured. We further hold that the complaint in this case states a claim of vicarious liability against Allstate Insurance Company for abuse of process, and we remand this claim to the Shelby County Circuit Court for further proceedings consistent with this opinion. However, the plaintiff's remaining claims against appellant Allstate Insurance Company, and all of her claims against appellant Larry McElwaney, are dismissed pursuant to Rule of Civil Procedure 12.02(6). The judgment of the Court of Appeals is affirmed in part and reversed in part.

Costs of this appeal are to be divided equally among the appellant, Allstate Insurance Company, and the appellee, Ms. Connie Jean Givens.

_____
WILLIAM M. BARKER, JUSTICE