NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0267n.06
Filed: April 17, 2006

Nos. 05-5219; 05-5220

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LAMARQUIST MATTHEWS, et al., | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHANIE A. STORGION, M.D., et al., | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Defendants, | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| STATE VOLUNTEER MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellant [05-5219], | ) | |
| | ) | |
| TERESA J. SIGMON; SIGMON LAW FIRM, | ) | |
| | ) | |
| Defendants-Appellants [05-5220]. | ) | |

Before: CLAY and COOK, Circuit Judges; RICE, District Judge.[*]

COOK, Circuit Judge. This suit stems from a state-court medical-malpractice case brought

by the guardian of a minor, LaMarquist Matthews, against Dr. Stephanie Storgion, alleging injuries

from the negligent placement of a catheter. In the course of that litigation, Storgion's attorney,

Teresa Sigmon, allegedly pressured one of Matthews's expert witnesses to withdraw from testifying.

---

[*]The Honorable Walter Herbert Rice, Judge of the United States District Court for the
Southern District of Ohio, sitting by designation.

Matthews then brought this case against the doctor, the defense lawyer, her law firm, and the malpractice carrier for: abuse of process, intentional interference with a business relationship, inducement/procurement of a breach of contract, and coercion of a witness. The district court dispensed with certain of the plaintiffs' claims on summary judgment—the witness-coercion claim, and all claims against the doctor—leaving for trial the remaining claims against the attorney and her law firm, and those against the insurance carrier. Those parties obtained leave to file this interlocutory appeal seeking review of the denial of summary judgment.

We determine that Tennessee law warranted the granting of summary judgment to the insurance carrier; it cannot be held vicariously liable for the acts of the lawyers and the firm. We further decide that summary judgment ought to have been granted to all defendants on the plaintiffs' claims for abuse of process. We affirm the remainder of the district court's decision.

I

The Appellants here include State Volunteer Mutual Insurance Company (SVMIC), Storgion's medical malpractice insurer, and the attorneys it retained to defend Dr. Storgion, Teresa J. Sigmon and the Sigmon Law Firm. Appellees are Matthews, through his guardian, together with the two law firms representing him.

In the underlying malpractice action, Matthews's attorneys identified Dr. Walter Scott, Ph.D., as an expert witness. While deposing Scott, Sigmon learned that he was an FDA employee

and that the FDA prohibited him from testifying as an expert witness, absent special permission that

he had not yet obtained. Scott had, however, obtained approval from his supervisor and other FDA

managers to testify as a "fact witness" and to act as a consultant in the case.

Sigmon and the attorneys for the other malpractice defendants sought to exclude Scott's

testimony on several grounds. First, they moved on the grounds that his lack of a medical license

rendered him incompetent to testify. The state court denied the motion. Next, they filed a motion

in limine, and the court deferred a ruling. Finally, they filed motion to exclude portions of Scott's

proposed testimony, which the court granted.

Two years after Scott's deposition, after the close of discovery and after the court ruled on

defendants' various motions to exclude, Sigmon e-mailed Scott's FDA supervisor, requesting a copy

of the FDA's approval of Scott's activities in the case and all other documents relating to Scott's

employment. Over a four-month period, Sigmon initiated several more communications with the

FDA. Sigmon reported to SVMIC and Storgion via e-mail about one of these FDA communications.

Ostensibly at the FDA's request, Sigmon also sent the FDA copies of Scott's deposition and of

certain pleadings. After these communications between Sigmon and the FDA, Scott withdrew his

services by letter to Matthews's attorney. Scott wrote that "Sigmon's inquiry . . . apparently raised

the specter of the possible impression of wrong-doing on [Scott's] part," and that his division

director ordered him to cease contact with the attorneys. This suit followed.

II

A.  Jurisdiction

As a threshold matter, Appellants contend that Appellees' claims fail the $75,000 amount-in-controversy requirement for this court's exercise of diversity jurisdiction.  This court "should consider the amount alleged in a complaint and should not dismiss a complaint for lack of subject matter jurisdiction unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount."  *Massachusetts Cas. Ins. Co. v. Harmon*,  88 F.3d 415, 416 (6th Cir. 1996) (quotation omitted) (setting out the standard for district courts); *see also Kovacs v. Chesley*, 406 F.3d 393 (6th Cir. 2005) (finding jurisdiction in the absence of a legal certainty that the plaintiff's claim did not meet the jurisdictional amount).  Appellees alleged "damages in excess of $75,000.00" for, among other things, sums paid to Scott for his services, for the time and expense involved in procuring replacement consultants/witnesses, and for punitive damages or statutory treble damages under TENN. CODE ANN. § 47-50-109 (2004).  Nothing indicates that Appellees could not in good faith claim the jurisdictional amount at the time they filed their complaint.  *See Kovacs*, 406 F.3d 395-96 (noting that events occurring after filing do not oust jurisdiction).  This court being unconvinced to a "legal certainty that the claim is really for less than the jurisdictional amount," we reach the merits of this suit.  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).

B.  The Merits

In considering an interlocutory appeal from the denial of summary judgment, this court reviews de novo the district court's denial if the decision turns on purely legal grounds, and for abuse of discretion if the presence of a genuine issue of material fact prompted the denial. *Black v. Roadway Express, Inc.*, 297 F.3d 445, 448 (6th Cir. 2002). A district court necessarily abuses its discretion, however, where it commits an error of law. *See Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *Southward v. South Cent. Ready Mix Supply Corp.*, 7 F.3d 487, 492 (6th Cir. 1993). As always, the court construes the evidence, and draws all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Fed. Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005).

## 1. Immunity

Appellants argue on appeal that absolute and qualified immunity shield them from liability for Appellees' claims. Appellants, however, neglected to advance these contentions before the district court and, absent any "exceptional circumstances," we will not "consider an issue not passed on below." *St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 995-96 (6th Cir. 2003) (quotation omitted). We find no exceptional circumstances here.

## 2. Vicarious Liability

SVMIC argues that it cannot be held vicariously liable for Sigmon's conduct. The parties agree on the pertinent facts—Sigmon informed SVMIC via email that she contacted the FDA in regard to Scott, and Sigmon later sent SVMIC billing statements reflecting her FDA contacts. SVMIC contends that silence following after-the-fact notice is inadequate to impose vicarious liability under Tennessee law. The district court, relying on *Givens v. Mullikin*, 75 S.W.3d 383 (Tenn. 2002), found a genuine issue of material fact as to whether "SVMIC's inaction in light of [its] direct knowledge [of Sigmon's conduct] infers [sic] that SVMIC at least in part knowingly authorized Sigmon's actions." SVMIC's conduct, however, falls short of the vicarious-liability test the Tennessee Supreme Court announced in *Givens*.

The *Givens* court held that insurers may be vicariously liable for acts or omissions of an attorney hired to represent an insured where the insurer exercised "invidious" actual control by "direct[ing], command[ing], or knowingly authoriz[ing]" the acts or omissions. *Id.* at 395; *see also id.* at 399 ("[S]ome exercise of actual control, whether it be through direction or knowing authorization, must be alleged before a complaint can be held to properly state such a claim."). To recover against an insurer for an attorney's conduct, "a plaintiff must show that the attorney's tortious actions were taken partly at the insurer's direction or with its knowing authorization." *Id.* at 396. The court explained that "cases in which an insurer may be held liable under an agency theory will be rare indeed." *Id.* at 395.

We find SVMIC's inaction following after-the-fact notice of Sigmon's conduct inadequate to constitute "actual control" under *Givens*. An insurer's exercise of actual control "seeks, either directly or indirectly, to affect the attorney's independent professional judgment, to interfere with the attorney's unqualified duty of loyalty to the insured, or to present a reasonable possibility of advancing an interest that would differ from that of the insured." *Id.* at 394 (quotation omitted). Sigmon exercised independent professional judgment in contacting the FDA, and her judgment could not have been affected by SVMIC's receipt of after-the-fact notice. *See id.* at 395-96 ("We do not hold today . . . that an insurer may be held liable for any acts or omissions resulting solely from the exercise of [the] attorney's independent professional judgment."). Although the district court found an issue of fact as to whether "SVMIC's inaction . . . knowingly authorized" Sigmon's conduct, the *Givens* court, in discussing "knowing authorization" as a component of "actual control," contemplated an active role in the attorney's conduct, certainly more than SVMIC's entirely passive conduct presented here. We therefore hold that the district court committed an error of law in denying summary judgment to SVMIC.

### 3. Wrongdoer by Ratification

Appellees proffer "wrongdoer by ratification" as an alternate theory under which to hold SVMIC vicariously liable for Sigmon's conduct. To this end, Appellees rely on the 1955 Tennessee Supreme Court case of *Howard v. Haven*, 281 S.W.2d 480 (Tenn. 1955), *superceded in part by statute as recognized in Cole v. Arnold*, 545 S.W.2d 95 (Tenn. 1977). A theory of wrongdoer by

ratification may remain viable in some contexts, but *Givens* expressly limited insurers' vicarious liability for an attorney's conduct to those situations in which the insurer exercises some form of actual control over the attorney's actions. *Givens*, 75 S.W.3d at 396. Appellees maintain that the ratification theory presented in *Howard* must be applicable in the insurance context because *Givens* cited *Howard*. But *Givens* cited *Howard* only for the proposition that, after *Givens*, an attorney remains subject to "direct liability for his or her own conduct." *Id.* at 398 n.8.

### 4. Abuse of Process

Appellees alleged abuse of process as Count I of their Complaint. Tennessee recognizes two elements to an abuse-of-process claim: (1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge. *Givens*, 75 S.W.3d 383, 400 (Tenn. 2002). Appellants argued in the district court that Appellees could prove neither element. First, Appellants contended that Appellees could not show Sigmon's malevolence and therefore could not satisfy the first element of the claim. Additionally, Appellants argued that Appellees pointed to no "process" Sigmon used in her activities. The district court identified a genuine issue of fact as to the first element—Sigmon's intent—without addressing the second.

Appellees claim that Sigmon's "asserting her position as a lawyer, sending [copies of] depositions and pleadings to Scott's supervisor, and . . . threat[ening to] pursu[e] further 'action' if she did not get what she wanted" constitute utilization of process. Tennessee, however, subscribes to a narrower definition of process. Tennessee courts have defined process as "that 'which emanates

from or rests upon court authority, and which constitutes a direction or demand that the person to whom it is addressed perform or refrain from doing some prescribed act.'" *Bell v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, No. 03A01-9707-CV-00292, 1998 WL 24414, at *2 (Tenn. Ct. App. Jan. 20, 1998) (quoting 1 AM. JUR. 2D *Abuse of Process* § 2 (1994)).  Abuse of process "refer[s] to the use of a writ, order, or command of the Court in the course of a judicial proceeding." *Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc.*, 358 F. Supp. 17, 21 (E.D. Tenn. 1972). Because Appellees point to nothing in Sigmon's conduct that "emanate[d] from or rest[ed] upon court authority," *Bell*, 1998 WL 24414, at *2, the district court erred in denying Appellees summary judgment on this claim.

## 5.  Intentional Interference with a Business Relationship

Count II of Appellees' Complaint alleges intentional interference with a business relationship.  This tort requires (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third parties; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to cause the breach or termination of the relationship; (4) the defendant's improper motive or improper means; and (5) damages.  *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).  Appellants proffer three reasons the district court erred in denying summary judgment on this claim.  First, they contend that no valid business relationship existed between Appellees and Dr. Scott.  Second, they argue that Appellees have failed

to demonstrate that Sigmon's conduct proximately caused Scott's withdrawal. Finally, they claim that Appellees failed to allege recoverable damages from Sigmon's actions.

a. Validity of the Business Relationship

Appellants first argue that no *valid* business relationship existed because FDA rules and Tennessee Regulations rendered illegal any business relationship between Appellees and Scott. Appellants' arguments regarding the invalidity of the business relationship fall short.

As the district court discussed, some question remains as to the nature of Appellees' relationship with Scott (e.g., whether Scott was to be a fact witness, an expert witness, or merely a consulting expert). The FDA cleared Scott to work in some capacity with Appellees; he obtained three approvals from his supervisors. Scott did not obtain approval to testify as an "expert witness," although FDA regulations permit such approval in rare cases. Appellants argue that any business relationship must have been illegal because Scott could not legally testify as a fact witness or as an expert witness.

First, Appellants point to Tennessee Supreme Court Rule 8, Ethical Consideration 7-28, for the proposition that "[a] lawyer should not pay or agree to pay a non-expert witness an amount in excess of reimbursement for expenses and financial loss incident to being a witness." Appellants claim this renders any fact-witness contract void. But Appellees refer to Scott only as an "expert" witness and consultant.

Appellants then point to a federal regulation they contend prohibits Scott's involvement as an expert witness. They cite to 21 CFR § 20.1(a), which forbids FDA employees, "except as authorized by the Commissioner," from providing "any testimony . . . with respect to any information acquired in the discharge of [their] official duties." As the district court pointed out, however, Scott obtained three separate authorizations for his work with Appellees—two for consulting work and one for testimony as a "witness of fact." Although labeling his role as "witness of fact," Scott delineated the bounds of his testimony in his request for approval: "to provide factual data about a device type (e.g. how it operates, what it is designed to do)" where the "litigants include patients, doctors and a hospital." Scott's departmental "Integrity Officer" approved the request after noting, "Federal Law only prohibits [this type of testimony] in matters before the federal government (18 U.S.C. 203 and 205). Since the government is not involved I see no impediment to your participation . . . ." Thus it appears that Scott obtained specific FDA authorization for his intended testimony, and it is not clear that a court's or party's characterization of Scott as an "expert witness" would control the FDA's internal approval procedures.[1] Even assuming, however, Scott's inability to testify as planned, Appellants have not demonstrated—in fact, do not even argue—Scott's *consulting* arrangement with the Appellees to be illegal or invalid.

---

[1]We note that the FDA regulation cited by Appellees prohibits, absent permission, testimony "pertaining to any function of the Food and Drug Administration or with respect to any information acquired in the discharge of his official duties." Thus the testimony that Scott could have provided under a valid business relationship would be limited to (1) the specific testimony for which he had FDA permission, or (2) other testimony pertaining neither to FDA functions nor information acquired as a result of Scott's official duties.

b. Proximate Cause

Appellants next contend that Appellees failed to show that Sigmon's actions proximately caused Scott's withdrawal. The Tennessee Supreme Court defines proximate cause as "a limit on the causal chain, such that, even though the plaintiff's injury would not have happened but for the defendant's [actions], defendants will not be held liable for injuries that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005). "Thus, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established." *Id.* (quotation omitted).

As the district court found, Sigmon "sent repeated letters and e-mails" to FDA personnel and "apparently suggested to [the FDA] in some manner that Dr. Scott had acted in violation of FDA policy." A reasonable person would foresee that such actions could result in Scott withdrawing his services.

Appellants argue that Sigmon's contacts with the FDA, alerting the agency to "facts that Dr. Scott himself should have disclosed to his superiors," only prompted the FDA to enforce its own regulations, so that Sigmon's conduct cannot be considered the proximate cause of Scott's withdrawal. It remains unclear, however, whether the FDA's prohibition of Scott's involvement resulted from its enforcement of its own regulations or instead merely from the FDA's exercise of an abundance of caution in response to an aggressive attorney. As discussed above, Appellants have

pointed to no FDA regulation that would prohibit Scott from acting as a consultant, nor is it clear

that any FDA regulation absolutely barred Scott's proposed testimony.

c.  Damages

Appellants' final argument with respect to the interference claim is that Appellees suffered

no recoverable damages.  Because the district court found a genuine issue of material fact as to

damages, this court reviews for an abuse of discretion.  Assuming Appellants correctly categorize

some of Appellees' alleged damages as overly-speculative, Appellants nonetheless fail to explain

why Appellees, if they succeed on the merits, would not be entitled to compensation for sums

already paid to Scott or for the time, effort, and expense required to procure a replacement

consultant/witness.  Nothing demonstrates that the district court abused its discretion in finding an

issue of fact here.

6.  Procurement of Breach

A claimant for inducement and procurement of breach of contract must show: (1) a legal

contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's

intention to induce its breach; (4) the defendant's malicious intent; (5) a breach of the contract; (6)

proximate cause of the breach; and (7) resultant damages.  *B&L Corp. v. Thomas & Thorngren, Inc.*,

162 S.W.3d 189, 218 (Tenn. Ct. App. 2004).

Appellants advance arguments against this claim identical to those advanced against intentional interference with a business relationship—the absence of a valid contract,[2] of proximate cause, and of damages—all addressed above in the context of intentional interference with a business relationship.

The single unique argument Appellants advance for this cause of action is that no contract existed for lack of mutual assent. Because the district court found a genuine issue of fact, we review for abuse of discretion. Appellants correctly note that Scott and Appellees characterized Scott's testimonial role differently. Scott announced that he intended to testify only as a fact witness, while Appellees proffered Scott as an "expert" witness. It is clear, however, that both parties expected Scott to render consultation services, and that Scott sought and obtained permission from his supervisors to testify, even generally describing the content of his expected testimony. Thus, the parties' differing characterizations of this one aspect of their alleged agreement is not necessarily determinative, and the district court did not abuse its discretion in finding a material issue of fact as to mutual assent.

III

---

[2]As with Appellees' claim for intentional interference with a business relationship, *see supra* n.1, the testimony that Scott could have provided under a valid contract would be limited to (1) the specific testimony for which he had FDA permission, or (2) other testimony pertaining neither to FDA functions nor information acquired as a result of Scott's official duties.

We conclude that the district court erred under Tennessee law in denying summary judgment in favor of SVMIC and in favor of all defendants on the abuse-of-process claim. We therefore reverse the district court's denial of summary judgment in those respects. We affirm the remainder of the district court's judgment.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** I concur in Section II, parts 2 and 3 of this opinion denying vicarious liability to the insurer, State Volunteer Mutual Insurance Company ("SVMIC"), and I also concur in part 4, and the finding that the district court erred in not granting Defendants' motion for summary judgment on the abuse of process claim. I dissent as to the remaining parts regarding the interference with a business relationship, and procurement of a breach of contract claims, and would grant Defendants' motion for summary judgment as to all claims.

As a preliminary matter, this action should be dismissed for lack of jurisdiction. As noted by the majority, Plaintiffs brought this suit in federal court pursuant to diversity jurisdiction, which requires that the parties be citizens of different states and that the amount in controversy exceed $75,000. The majority correctly states that the sum claimed by the plaintiff controls if the claim is apparently made in good faith, and the case cannot be dismissed for not meeting the "amount in controversy requirement" unless it appears "to a legal certainty that the claim is really for less than the jurisdictional amount." *Rosen v. Chrysler Corp.*, 205 F.3d 918, 921 (6th Cir. 2000). The majority incorrectly concludes, however, that "nothing indicates that [Plaintiffs] could not in good faith claim the jurisdictional amount at the time they filed their complaint" and that we should, therefore reach the merits of the case. To the contrary, it appears to a legal certainty that the claim really is for less than the jurisdictional amount and that Plaintiffs cannot in good faith claim that the jurisdictional amount has been met. A plaintiff's "good faith in choosing the federal forum is open to challenge not only by resort to the face of his complaint, but by the facts disclosed at trial, and

if from either source it is clear that his claim never could have amounted to the sum necessary to give jurisdiction there is no injustice in dismissing the suit." *Gafford v. General Elec. Co.*, 997 F.2d 150, 157 (6th Cir. 1993). "Indeed, this is the court's duty under the [Judiciary] Act of 1875." *Id.*

It would not be an injustice to dismiss this suit where it appears to a legal certainty that Plaintiffs cannot meet the jurisdictional amount. In the complaint, Plaintiffs claim damages for the loss of "the use and benefit of significant amounts of time, effort, money and other professional resources associated with the prior business relationship with Dr. Scott," and Plaintiffs further claim that they incurred additional expenses in their efforts to seek another expert to replace Scott. (J.A. at 23-24.) Plaintiffs allege damages in excess of $75,000 on all their individual tort claims, treble damages on the inducement to breach of contract and intentional interference with a business relationship and coercion of witness claims, and also seek punitive damages. Despite these contentions, however, Plaintiffs have not provided this Court or the district court with any starting point for estimating damages for the purpose of establishing jurisdiction. All we know is that Plaintiffs paid Scott $25 per hour for his clerical services and $175 per hour for his "opinions." As of 2000, Scott estimated that his fees totaled approximately $4000. We do not know how many hours Plaintiffs claim Scott worked in total or how much they had to pay the new expert, nor how much time and money was expended procuring the new expert. It seems clear, however, that at a rate of $175 per hour, even with treble damages, Plaintiffs still could not make a good faith claim of $75,000 in damages as a result of the loss of Scott as a witness. Consequently, we should refrain

from reaching the merits of this cause of action and dismiss as a result of Plaintiffs' inability to meet the "amount in controversy" requirement of § 1332.

Although I conclude that jurisdiction is lacking, we could, in the alternative, reach the merits and reverse the district court's denial of Defendants' motion for summary judgment as to all claims and dismiss the action for failure to state a claim upon which relief could be granted. It does not appear that Defendants Teresa Sigmon and the Sigmon law firm have done anything wrong, and it is extremely troubling that Plaintiffs are being permitted to utilize these tort claims to punish an attorney who did nothing more than to zealously represent her client and investigate and litigate her case in an appropriate manner.

It was Defendant Teresa Sigmon's right and duty to ascertain the capacity in which Scott would be testifying and his appropriateness as a witness. The Tennessee Rules of Professional Conduct state that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Tenn. Sup. Ct. Rule 8, Canon 1.3 (2005). The comments to this rule provide that:

> A lawyer shall pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.

*Id.* The record reveals that Sigmon's actions were nothing more than those of an attorney properly and zealously representing her client.

Plaintiffs initially identified Scott as an expert witness. After Defendants challenged Scott's suitability as an expert, the trial court ruled that Scott could not testify as to the applicable standard of care. Defendants subsequently deposed Scott, at which time Scott revealed that he was employed by the FDA and was testifying as a fact witness, not an expert witness, and that the FDA in fact prohibited him from testifying as an expert witness. Scott also testified during the deposition that his supervisor at the FDA, Cornelia Rooks, was aware of his participation in the trial as a "consultant and witness of fact." (J.A. at 129.) Scott further stated that he was uncertain whether or not he would be testifying at trial, but that the FDA had not yet approved him testifying and he did not know the FDA's policy on whether he would be permitted to testify. As noted above, Scott claimed that at a rate of $25 per hour for clerical work and $175 per hour for opinion testimony, he had been paid approximately $4000 as of July for his services. After the deposition, Defendants again sought to exclude Scott, but Plaintiffs claimed that Scott would be testifying only as a fact witness and would not testify as to the acceptable professional standard of care for physicians. The state court denied Defendants' motion.

In August 2002, as trial approached, Defendant Sigmon contacted Cornelia Rooks at the FDA via email, and requested information regarding whether Scott had been granted permission to testify in the underlying suit, along with copies of Scott's employment information and the FDA's policies regarding the participation of FDA employees in litigation. The matter was referred to the Ann Smith from the department of regulatory affairs, who according to Defendant Sigmon, seemed incredulous about the fact that Scott was being paid for his participation in the suit. Smith requested

information regarding the type of opinions that Scott was offering and evidence that Scott had been paid. There were a few more communications between Sigmon and the FDA in which Sigmon repeated her information requests. Ultimately, after being made aware of the circumstances by Sigmon's inquiries, the FDA forced Scott to withdraw his participation in the lawsuit, with the admonition that as an employee, Scott should not give "'testimony' in outside legal contests that may involve the FDA." (J.A. at 198.) Internal agency emails reveal that the FDA was troubled by the fact that Scott had been paid for his participation in the trial, and with Scott's actual role in the case.

Sigmon, in contacting the FDA regarding Scott's authorization to testify as an expert, did nothing more than fulfill her obligation to represent her client. Once it became apparent to Sigmon that Scott may have been acting outside of his capacity as an FDA employee, it was Sigmon's duty to do everything legally and ethically permissible to discover whether Scott was exceeding his authorization from the FDA. It should be remembered that Scott had testified that he was complying with FDA guidelines regarding witness testimony by FDA employees. It was also Sigmon's duty to determine what guidelines the FDA had established for its employees who might be witnesses in order to determine whether such guidelines or instructions might affect Scott's testimony. In other words, the information being sought by Sigmon was extremely relevant to Scott's credibility as a witness.

There is absolutely no rule in the Tennessee Rules of Conduct or anywhere else that prohibited Sigmon from contacting Scott's employer under these circumstances. It seems that Sigmon's inquiry into whether Scott was exceeding his authority proved justifiable inasmuch as the FDA did in fact pull Scott from the case, apparently because it was troubled by the fact that Scott was being paid and because his role in the trial was potentially violative of government guidelines. Sigmon merely pursued information which was critical to her trial preparation. The fact that the FDA ultimately determined that Scott's participation in the trial was contrary to its policies was a fact that likely rendered Scott impeachable as a witness – further confirmation that Sigmon was justified in pursuing the matter on behalf of her client.

In preparation of her case for trial, Sigmon pursued a legitimate course of action after having received conflicting information regarding whether Scott would testify as a fact witness or an expert witness. Again, if Scott was operating outside the permissible bounds of his authority from the FDA, and getting paid when he should not have, then this raised a credibility issue that Sigmon would have been allowed to go into at trial, and she was therefore permitted to investigate the matter. The fact that the state court had ruled that Scott could testify did not moot the issue where it was still not clear whether the FDA had actually agreed to permit Scott to testify, or whether Scott's testimony would actually constitute expert testimony.

Plaintiffs represented to the state court that Scott was a fact witness, not an expert, but represented to the district court and this Court that Defendants interfered with their business

relationship with Scott or sought to induce a breach of contract by depriving them of a retained expert witness. These are wholly inconsistent positions, and Plaintiffs should not be permitted to bring suit in tort against opposing counsel for trying to ascertain the status of a witness about which Plaintiffs themselves have been vague and contradictory. If, as Plaintiffs claim, Scott was only a fact witness, then Scott should not have been paid for his services. If Scott was a mere consultant, then perhaps Scott should not have been deposed or allowed to testify as a witness since presumably his only role would have been to assist Plaintiffs' attorneys in the preparation of their case. It would appear that Plaintiffs themselves were the source of the confusion regarding Scott's role in the case, which should preclude them from being allowed to sue Defendants in federal court for these torts.

Furthermore, it is an abuse of the adversary system to pursue these types of claims against opposing counsel for actions legitimately undertaken by them in furtherance of the litigation, and these claims should all have been dismissed on summary judgment. The majority argues that Defendants' actions technically meet the elements of the torts of intentional interference with a business relationship and inducement and procurement of breach of contract; however, even if Plaintiffs' claims technically fit within the legal framework of these torts, that does not mean that these are not frivolous and improper claims. These claims arose out of actions that were legitimately undertaken by counsel in the course of litigation, not as a result of business dealings, and are not the proper subject for a lawsuit in this context.[3] Plaintiffs employed Scott as a fact witness or consultant

[3]Other jurisdictions within this Circuit have in fact held that attorneys are immune from liability to other persons for conduct that arises from acts performed during representation of their clients. *See, e.g., Dowling v. Select Portfolio Servicing, Inc.*, Slip Copy, 2006 WL 571895, *8

or expert, depending on which of Plaintiffs contentions one believes. Plaintiffs did not have a business relationship with Scott in the traditional sense of the word, and Defendants did not interfere with a business relationship or procure a breach of contract. Defendant Sigmon was merely investigating a witness for the opposing side in preparation for trial. Sigmon was concerned with the potential impact of Scott's testimony on her client's case and she acted within the bounds of professional responsibility in investigating whether he had permission from the FDA to testify, and in what capacity.

In concluding that Plaintiffs should survive summary judgment on the intentional interference with a business relationship claim, the majority relies upon the holding in *Trau-Med of America, INC., v. Allstate Insurance Co.*, 71 S.W. 3d. 691, 701 (Tenn. 2002), in which the Tennessee Supreme Court held that Trau-Med had in fact stated a claim for tortious interference with a business relationship against defendant Allstate, whom plaintiffs were seeking to hold vicariously liable in tort. What the majority fails to note, however, is that *Trau-Med* involved an actual claim that plaintiff's business interests had been affected as a result of Allstate's interference. Specifically, Trau-Med claimed that Allstate "interfered with six specific actions filed in the Circuit Court of Shelby County by making false statements about the propriety of Trau-Med's business and by threatening to protract the litigation process" and as a result of this conduct, "'[p]laintiff-

---

(S.D.Ohio) ("Under Ohio law, attorneys enjoy immunity from liability to third persons arising from acts performed in good faith on behalf of, and with the knowledge of, their clients.").

attorneys, claimants, and others, . . . because of fear of litigation and other reasons, [have been

induced] not to refer persons and to discontinue use of plaintiff's clinic' . . . [and] this improper

interference with its existing business relationships resulted in substantial economic harm to Trau-

Med." *Id*. at 701-02.

In contrast, Plaintiffs here do not allege economic harm to an actual business interest.

Plaintiffs' only claim is that as a result of Defendants' actions, they lost and had to replace a key

witness. That is not the type of  business relationship contemplated by the Tennessee Supreme

Court to sustain a claim of intentional interference with a business relationship. The *Trau-Med*

court, in expressly adopting the tort of intentional interference with a business contract, provided

guidance as to its potential uses by referring to  § 766B comment c of the Restatement (Second) of

Torts, which provides:

> The relations protected against intentional interference by the rule stated in this
> Section include any prospective contractual relations, except those leading to
> contracts to marry, if the potential contract would be of pecuniary value to the
> plaintiff. Included are interferences with the prospect of obtaining employment or
> employees, the opportunity of selling or buying land or chattels or services, and any
> other relations leading to potentially profitable contracts. Interference with the
> exercise by a third party of an option to renew or extend a contract with the plaintiff
> is also included. *Also included is interference with a continuing business or other
> customary relationship not amounting to a formal contract*.

*Trau-Med*,  71 S.W.3d at 701 (emphasis in original).  Nothing in the language of the Restatement

cited above would lead to the conclusion that this tort should be applied to the situation at hand, and

I would, as a consequence, have granted Defendants' motion for summary judgment.

In conclusion, Plaintiffs' claims should be dismissed for not meeting the jurisdictional amount, or in the alternative, for failing to state a claim upon which relief can be granted.