IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 27, 2012 Session

## ROBERT REECE ET AL. v. HELEN S. VALOIS ET AL.

Appeal from the Chancery Court for Johnson County
No. 6293      G. Richard Johnson, Chancellor

No. E2011-02615-COA-R3-CV-FILED-SEPTEMBER 27, 2012

The issue in this case is whether a warranty deed made by a 98-year-old uncle to his 85-year-old niece should be set aside for lack of competence or undue influence. Following a bench trial, the court found that the uncle was competent and that the niece did not exert undue influence on him. The uncle's children appeal. We hold that the evidence does not preponderate against the trial court's findings. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

John Banks, Elizabethton, Tennessee, for the appellants, Robert Reece, individually and as administrator of the estate of Benjamin Harvey Reece; Judy Reece Arwood; Jerry Reece; and Richard Reece.

George T. Wright, Mountain City, Tennessee, for the appellee, Helen S. Valois.

**OPINION**

I.

This is an action to set aside a warranty deed executed by Benjamin Harvey Reece ("the Uncle") to his niece, Helen S. Valois ("the Niece"), on June 10, 2008. The deed transferred 39 acres of mountain land ("the Mountain Land") that the Uncle acquired in 1993 from his sister, Victoria Reece. Victoria, who predeceased her brother, is the Niece's aunt.

The action was initially filed by all of the Uncle's children, "on behalf of [the Uncle], their father." In April 2009, the Uncle's son, Robert Reece, was appointed in North Carolina – the state of the Uncle's residence – as "general guardian" over the Uncle's person and property. In light of the guardianship, the complaint was amended to reflect that each child was a plaintiff individually and in a representative capacity on behalf of the Uncle. The Uncle died on February 24, 2010, just short of his 100th birthday. Robert was appointed in North Carolina as the administrator of the Uncle's estate. This resulted in a second amended complaint. Where possible, we will refer to the plaintiffs collectively as "the Children." Because of all the common last names, we will occasionally refer to a party or person by his or her first name. Those references, however, should not be interpreted as a suggestion of familiarity or disrespect.

As of June 10, 2008, the Uncle was 98 years of age. Despite his advanced age, he lived alone on his 108 acre farm in North Carolina, a very short distance from the Mountain Land. The Uncle received daily assistance from his family with respect to his medications, meals, and housekeeping. His medical problems as of that date included a history of prostate surgery, heart attack, hip replacement, hearing impairment and diminished vision. By all accounts, he was "proud," "independent," and "private," including with regard to his financial affairs. Nevertheless, he allowed his son Robert to be a signatory on his bank account because he would sometimes forget to pay his bills.

The Niece was 85 years of age on June 10, 2008. The Uncle was the youngest brother of the Niece's mother. The Niece lives in Hilton Head, South Carolina, but spent her summers in Newland, North Carolina. Newland is close to the Mountain Land. While in Newland, the Niece would visit with the Uncle periodically. According to the Niece, the Uncle lived in her family's home while he finished high school.

The trial court made some specific findings as to the relationship between the Uncle and the Niece, which bear repeating here:

> The [Niece] and [the Uncle] had a good, healthy, wholesome,
> enduring, loving relationship through the years. When she did
> not come to visit him in person, which may be . . . two to four
> times per year, she would send him . . . small gifts from time to
> time. He liked her.

On June 9, 2008, the Niece, in the Uncle's presence, stated to Robert Reece that she was taking the Uncle to a lawyer's office and he was going to make her a deed to the Mountain Land. Robert protested that no such thing was going to happen. Robert later testified that the Niece assured him that she was buying the land. Robert was satisfied with

that response even though, according to Robert, they did not discuss how much she was paying for the property.

The Niece did in fact pick the Uncle up at his home on June 10, 2008. He rode with her to the office of attorney Bill Cockett in Mountain City. According to the Niece, she had never before driven to Mountain City; she followed her Uncle's directions until they came to a sign in front of a lawyer's office. The Niece went inside, spoke to the receptionist about what they needed, and then summoned the Uncle to come inside. Mr. Cockett interviewed the Uncle, and prepared the deed. She walked across the street and recorded the deed. She took the Uncle back home where she encountered Robert and his wife, Barbara. According to the Niece, Barbara became very angry when told that the Uncle did in fact deed the Mountain Land to the Niece. Robert, according to the Niece, was much more cordial. However, he later made an issue of the matter by demanding payment. The Niece responded that the transfer of the land was a gift. This action was filed shortly thereafter.

At trial, all of the Children and the Niece testified. The Uncle's treating physician testified by deposition as did attorney Cockett and one of his associates who helped him interview the Uncle. Regrettably, the record before us does not include the deposition of the physician or his notes that were attached to his deposition as an exhibit. Also missing are the depositions of the attorneys. Our best indication of the content and flavor of that testimony is in the court's lengthy opinion announced from the bench. Accordingly, we have repeated that excerpt from the opinion:

> . . . . They came to the office of Bill Cockett, a lawyer here in Mountain City, and . . . they went into Mr. Cockett's office; and he had never met either one of them before. He had never done any business for either one of them before and the receptionist came back and said, "There's a couple out here who want you to draft a deed."
>
> Well, he sat down and talked with them and immediately recognized that [the Uncle] was an elderly gentleman. And since Mr. Cockett had been practicing law for 30 years, plus, and had devoted those 30 years primarily to the real estate practice of law, when he saw [the Uncle], red flags went off. . . . [H]e explained that experienced real estate lawyers know that when an elderly person comes into their office and wants to deed some property away to someone other than their children, he says, "It's a red flag. . . ." So any time that an elderly person comes into my office, it's standard procedure,

-3-

every time, that we absolutely assure ourselves that they know what they're doing, that they're competent to sign the deed."

So, he took extra time to chat with [the Uncle]; and he doesn't remember what all they talked about, but he remembers, of course, [the Uncle] knew the basics, what day and month and name, etc., etc.; and he says that it's his recollection that [the Uncle] brought the deed with him, the original deed from Victoria to [the Uncle] on the [Mountain Land]. And Mr. Cockett goes on to explain that he did not go to the courthouse and look up the description . . . and that the only way he could have gotten it was by someone giving it to him. And it's his recollection . . . that the way he got the description . . . was that [the Uncle] had the original deed from Victoria . . . "in its blue cover."

* * *

So, [the Uncle] evidently had the wherewithal to, first, know that he was going to deed that property because he brought a copy of the deed with him. He had announced it along with the [Niece] to at least Robert and his wife and maybe some other people the night before. . . .

He is absolutely sure that [the Uncle] was competent and had the capacity to understand what he was doing and that he wanted to do it. . . .

So, then we get down to, "Well, . . . [w]hat is the value of this property?" Well, the long and short of it is that neither [the Uncle] nor [the Niece] knew the value of the property. Mr. Cockett's recollection is . . . that he . . . called somebody. He thinks he called the County Trustee's office to find out what the tax value was; and it's his recollection it was around $35,000. But, of course, now we know when, we look to the deed from Victoria to [the Uncle], that that deed[] also recites "$35,000."

So, when they decided on the $35,000, Mr. Cockett became concerned about the payment terms, and there was some discussion. [The Uncle] said he didn't care. He didn't want

-4-

anything. There was this $5,000 that had been paid to Mr. Bunton to make a right-of-way into the property and a pond. So, there was at least $5,000 passed between the [Niece] and [the Uncle]. The $5,000 was cashed and deposited into his account and no problem.

But, Mr. Cockett . . .said, "Well, what do we do about the other $30,000? . . ." He then began a discussion with the parties about gift taxes. . . . And, they said, "Yeah. Okay, we'll make it a gift, whatever, that's fine, yes, it's a gift." And he said, "Well, you know, if it's a gift then you've got to think about gift taxes" and he talked about that with them. . . . And [the Uncle] wasn't overly concerned.

[The Uncle] said he didn't want the money, that everything was okay, he would take the $5,000. And then the question came up, "Well, did the [Niece] give him the other $30,000?" She swore unequivocally she did, she wrote him a check for it. The check was never cashed and never found, and she didn't bring her check register, and wasn't asked to.

Both Mr. Cockett and another lawyer he called in there . . . saw the [Niece] pass a check to [the Uncle]. They did not see the check itself, the details; they saw her pass a check. Was the check for $5,000 or $30,000 or $35,000? Was it one check or was there two? One check is here, it's for the $5,000 and it's very evident from Mr. Cockett's deposition that [the Uncle] was satisfied with the $5,000; he just wanted her to have the property.

. . . . And Mr. Cockett remembered that [the Uncle] had mentioned that he and Victoria, i.e., his sister, wanted the [Niece] to have this property. And . . . Mr. Cockett makes it clear to this Court.

. . . Mr. Cockett . . . made notes about what happened that day, and the notes are in the record and part of an exhibit. Yeah, looking at my notes now, in the deposition Mr. Cockett told us that, "[the Uncle] said, 'Victoria wanted her,' " the [Niece], " ' to have the property.' " And confirms several times that [the

Uncle] had said that his children knew about it, i.e., the conversation the night before, and they were okay with it.

* * *

So, Mr. Cockett, to again assure himself as a professional that [the Uncle] was competent and could sign the deed, he called another attorney in the office, a lady by the name of Sarah Lawson. And she had been in practice . . . since '96 or so . . .; and her line of work also was real estate and she did some other things but she reiterated that the policy in their office was when anybody elderly comes in and wants to convey property to someone other than their children, there's this process they go through. And she has to come in and chat with the people and look them over. And so she did.

. . . . And in her presence, Mr. Cockett continued some of the colloquy between he and the [Niece] and [the Uncle]. And while Ms. Lawson was in the room, Mr. Cockett talked about . . . lots of stuff, but one thing she could remember was the gift tax. And while she was in the room, she saw the [Niece] pass a check to [the Uncle]. And when asked what the check was for, . . . "She," the [Niece], "was going to pay him for the property." And she was only in there about ten minutes but she said that chatting, looking and talking, that he appeared fully competent, knew what he was doing, and was very capable of signing the deed.

* * *

Well, here's this elderly man that it's alleged that he doesn't know what he's doing, he's getting up every morning, he's putting his own clothes on. . . . He, very definitely, from the . . . testimony of the children, their father was not totally incompetent and incapacitated all the time. Very obvious[ly], he had lucid moments with them from time to time.

So, the [Children] did . . . what they should do, they took the deposition of Dr. Whitlock. He is an internal medicine doctor in Boone, North Carolina; again, just a few miles over the line

-6-

here from Mountain City. And he is Board-certified in the sub-specialty of geriatrics, the medicine for old people. He had known [the Uncle] for several years, had treated him at least since the 1990's, I think, at a time when [the Uncle] was in his nineties. And if you look at his notes that are attached to his deposition as an exhibit . . . one comes to the general conclusion that Dr. Whitlock did not commit himself to the incapacity to the point that [the Uncle] could not make decisions until after this lawsuit was brought and at the time when the children asked for an opinion letter.

I cannot find in those notes . . . anything in May, June, July. I can't find anything in there . . . at the time that [the Uncle] executed this deed.

Of course, it may be because lawyers and judges like the witnesses to answer directly, but in his notes and in his summaries from his office, he hops, skips and jumps a bit about "Was [the Uncle] lucid at the time he signed this deed?" The answer . . . was, "Well, he had difficulty making decisions." And then he said, "Well, he was impaired. He did have hip surgery. He was a little hard of hearing. He couldn't see too good."

And about the closest we get to . . . tying Dr. Whitlock down is in his deposition. But you've got to remember that this physician does not state anywhere . . . that he saw [the Uncle] . . . close to June of [2008]. . . .

\* \* \*

In 2009, Dr. Whitlock writes the opinion letter. He says that the physical examination of [the Uncle], quote, "suggests a subcortical dementia." Says "he's factually impaired and he may know the day and week and month, but he has little insight," he says "into events or life decisions." And then, this is another example of how Dr. Whitlock answers the question, "Did [the Uncle] have the capacity to sign that deed in June of [2008]?" And he says, "Not only is it my professional opinion now that any major decisions made by [the Uncle] over the last

-7-

year would have been made with limited faculties, but I believe that he needs concerted family to help make decisions for him in the future."

"Limited faculties?" Limited faculties in and of itself does not mean that someone is incompetent to sign a deed. It doesn't mean someone doesn't have the capacity to sign the deed. In spite of all that, Dr. Whitlock opined that [the Uncle] had limited faculties, had impaired judgment, was not good at making decisions; and that's what I mean about the good doctor hop, skipping and dancing around this most crucial question.

When pressed, he answered more specifically and then in Lawyer Cockett's deposition there's a most interesting turn of events. One of the attorneys asked Mr. Cockett if he knows this doctor. He said I've known him for 30 years. ["]How have you known this doctor over in Boone for 30 years? Because my wife is a doctor over there." . . . "And I've dealt with Dr. Whitlock on other matters about similar to this."

And Mr. Cockett's opinion was that Dr. Whitlock was way to quick to the draw about declaring people incompetent when their children asked him to, and he led me to believe in his deposition that that was Dr. Whitlock's reputation. You know, "If it'll help the children and help my patient, I'll say they're incompetent." And, I'm sure there are medical reasons for Dr. Whitlock's opinion, but, to me, not only his deposition, his opinion letter, these notes, they're not very convincing, they're not very persuasive.

* * *

There is very definitely animosity between [the Uncle]'s children. I pick up particularly on his daughter-in-law, Barbara, some from Robert, that they are very upset that their father would make a gift of this property or sell it – well, make a gift; they said it was okay to sell . . . this property to their cousin, their dad's niece. And Robert Reece confirms for us that when [the Uncle] told Robert the night before, about "I'm going to execute this deed tomorrow," Robert's testimony was that he

asked his cousin, the [Niece], what the value of the property was. She said, "I don't know." And this is when, according to Robert's testimony, that the [Niece] told Robert, "This property was promised to me from Aunt Victoria."

And if you follow the line that's being drawn, it's pretty easy to see what the brother to Aunt Victoria was doing; he was fulfilling a promise. Maybe he and Aunt Victoria had this in mind all along, but Robert testifies that the [Niece] told him that this property was promised to her from Aunt Victoria. And of course, Aunt Victoria deeded it to [the Uncle], as I've mentioned in '93.

And, when this matter came to a semi-head outside of court, before court, Robert was not very pleased. He said, "Well, okay, go ahead, pay full value for it." . . .

* * *

I was shocked a little bit on cross-exam when Mr. Robert Reece said that he didn't tell the [Niece], quote, "nothing" about his father's mental condition. . . . And the night before [when] the gift or conveyance was announced, Robert did not take that opportunity to take the [Niece] aside and tell her all that he is now telling the Court about his father's alleged incompetence.

* * *

After [the Uncle] was admitted to the nursing home care facility, and I recollect that to be about April of . . . '09. He died in February of 2010. You know, in addition to those findings that I've made that in my mind show that [the Uncle] knew what he was doing when he signed this deed, let's don't forget, too, about [the Uncle] being independent, proud, just a fine hard old guy. Everybody describes him as a gentleman.

Let's don't forget that he had other property. In other words, he was not impoverishing himself by conveying . . . the [Mountain Land] to the [Niece]. He had a million-dollar farm across the line here and they say the farm is worth – the 108 acres is worth

-9-

a million because it's right across the street from . . . Beech Mountain Resort . . . So, my point is, he was not impoverishing himself by conveying this property.

There was hostility. Robert Reece admits it . . . on cross-examination. There was a discussion about [the Uncle] being concerned that Robert . . . and the kids were going to put him in the nursing home. And [the Uncle]. . . was hostile toward him because [the Uncle] thought that Robert and the children were trying to put him in a nursing home and he didn't want to go.

Again, Robert Reece makes it abundantly, crystal clear; he said this on direct several times, in his discovery deposition, on cross-examination in court. The children agreed with this so long as she pays what it's worth. In other words, "If it's a purchase for fair consideration, that's fine with us; but if it was a gift, no way." . . .

* * *

There's a right-of-way into the property. [The Uncle] knew that. He knew that on the [Mountain Land] that there was a right-of-way issue "and if we're getting the deed done, we ought to tell the lawyer about that." And [the Uncle] had enough presence of mind to do that because they talked about it. And Mr. Cockett was briefly concerned with it until he satisfied himself that the right-of-way was okay. . . .

Well, did [the Uncle] have the capacity and the competency to sign, execute, that deed in June of '08? Well, we start off first with a premise, and the premise . . . is that in Tennessee there is a presumption that adult persons are sane rather than insane and capable rather than incapable to direct their personal affairs until satisfactory evidence to the contrary is presented; mental or physical impairment should never be presumed.

Well, . . . the [Children] have the burden of proof by a preponderance of the evidence . . . because there's a presumption in the law that [the Uncle] knew what he was doing . . . . [J]ust because you're an old guy or an old woman doesn't

-10-

mean that you don't have the sense to do what you're doing. Age, in and of itself, is not conclusive at all of a person's capacity, mental capacity, to sign a deed.

This Court concludes that [the Uncle] had an intelligent comprehension of the act of transferring this property, that there has not been an iota of evidence in this record that there's been any improper influence on him, coercion, duress to make him do this; zero, zilch.

The Court finds that the execution of the deed from [the Uncle] to the [Niece] was a conscious, voluntary, intelligent act that he comprehended. He understood what he was doing. Now, you understand that in Tennessee . . . it's not necessary that [the Uncle] dispose of his property with judgment or discretion; it's just necessary that he understands what he is doing. . . .

Not only was he not under any undue influence, he was not under any improper influence of any kind that was exerted by the [Niece] to obtain this conveyance, and there's no suspicious circumstances. . . .

[The Uncle] intended to make this gift and he had love and affection for the [Niece], enduring love and affection for many years; not just this one time, for many years. And with Aunt Victoria, [the Uncle]'s sister, evidently, there was a relationship there too.

[The Niece] never had the type of close, personal, confidential relationship that would require me to set aside the deed. . . . At the time that [the Uncle] signed this deed he was lucid. The theories of the [Children] were not proven by a preponderance of the evidence. Accordingly, the Court denies the request to set aside the deed and taxes the cost to the [Children]. . . .

The court incorporated its memorandum opinion into the judgment.

II.

The substance of the Children's five issues is captured completely in the last two, which are:

Whether the evidence preponderates against the Chancellor's findings of fact.

Whether the Chancellor correctly applied the law to the facts.

III.

Our standard of review of a trial court's findings of fact in a bench trial is set by Tenn. R. App. 13(d) . The court's findings are presumed correct unless the evidence preponderates against them. *Id*. However, we "will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). This deference is based upon the realization that

trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations.

*Id*. (citations omitted). Moreover, in the absence of transcripts of the testimony that relate to the findings being challenged, "we conclusively presume that the findings of fact made by the trial court are supported by the evidence and are correct." ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)(*citing **J.C. Bradford & Co. v. Martin Constr. Co.**, 576 S.W.2d 586, 587 (Tenn.1979)). The trial court's conclusions of law are reviewed de novo without any presumption of correctness. ***C-Wood Lumber Co. v. Wayne County Banks***, 233 S.W.3d 263, 272 (Tenn. Ct. App. 2007).

IV.

The Children characterize the Uncle as weak, frail, and easily influenced. In their view, he was completely at the mercy of the Niece. They believe she more or less kidnaped him from his home, and took him to a lawyer's office that she knew would help her in her evil plan to take the Uncle's property. While there, the thought process goes, she told the lawyer what was to be done and he, in total disregard of the Uncle's limitations, drew up the

deed and watched while the Uncle signed it. The problem with this argument is that it completely disregards the factual findings of the trial court. The trial court found that the Uncle was proud and independent. The trial court also found that the Uncle and the Niece announced their intentions the night before the transfer was made. The court further found that the Uncle had enough presence of mind to know that the deed from Victoria would be helpful; therefore, he took it, in its "blue cover," to the lawyer's office. The court opined that the Uncle wanted to honor the wishes of his sister, Victoria – from whom he had acquired the land for less than fair market value – that the Niece have the land. The court found that the Uncle was knowledgeable and conversant concerning the right-of-way and the $5,000 in expenses he had incurred. With respect to the credibility determinations implicit in the trial court's findings, there is no "clear and convincing evidence to the contrary." *Wells*, 9 S.W.3d at 783. In evaluating the evidence in this case, we are hampered by the absence of the deposition testimony of two key witnesses, Mr. Cockett and Dr. Whitlock. In the absence of these depositions, we must presume that the trial court's findings with respect to the testimony of these two witnesses are correct. *In re M.L.D.*, 182 S.W.3d at 894.

While we are on the critical subject of the Uncle' competence, it will be helpful to put the Children's argument in perspective. The thrust of their argument is that their father, the Uncle, could not have been competent to execute the deed because he was later diagnosed with dementia that must have existed at the time he signed the deed. Numerous appellate opinions can be found which have affirmed a trial court's finding that a person was competent to execute a document despite pre-existing dementia. *See, e.g.*, *Fell v. Rambo*, 36 S.W.3d 837, 846-47 (Tenn. Ct. App. 2000) (a reviewing court will not second guess trial court for rejecting testimony of expert who saw the person after the fact and testified that her dementia prevented the person from being lucid); *Dickson v. Long*, No. M2008-00279-COA-R3-CV, 2009 WL 961784 at *3 (Tenn. Ct. App. M.S., filed April 8, 2009)(evidence of dementia does not prove incompetence with regard to a particular transaction). The trial court was correct, also, that a person does not have to exercise "judgment and discretion" to be competent; all the law requires is that a person understand the "nature, extent, character, and effect of the transaction." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001). Whether or not a person has that capacity is a question entrusted to the trier of fact. *Dickson*, 2009 WL 961784 at * 3. As we have stated, the trial court in this case determined that the Uncle was competent to sign the deed and there is not clear or convincing evidence to disturb that finding.

The Children also argue that the trial court failed to analyze this case under the general outline for confidential relationships and undue influence articulated in *Kelley v. Johns*, 96 S.W.3d 189 (Tenn. Ct. App. 2002). They repeat the following language from *Kelley* in their brief:

The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; and (3) the beneficiary's active involvement in procuring the will. *In re Elam's Estate*, 738 S.W.2d 169, 173 (Tenn. 1987); *In re Estate of Hamilton v. Morris*, 67 S.W.3d 786, 792 (Tenn. Ct. App. 2001); *Fell v. Rambo*, 36 S.W.3d 837, 847-48 (Tenn. Ct. App. 2000). In addition to proof of a transaction benefitting the dominant person in a confidential relationship, other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. *Halle v. Summerfield*, 199 Tenn. at 454-57, 287 S.W.2d at 61-62; *In re Estate of Maddox*, 60 S.W.3d at 89; *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989); 1 *Pritchard on Wills* § 148, at 233.

\* \* \*

Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, it is any relationship that gives one person the ability to exercise dominion and control over another. *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002); *Childress v. Currie*, 74 S.W.3d at 328; *Mitchell v. Smith*, 779 S.W.2d at 389. It is not merely a relationship of mutual trust and confidence, but rather it is one

> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

-14-

> *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).

*Id*. at 196-197. The Children's reliance on *Kelley* is misplaced for several reasons. The full text of the opinion shows that the first paragraph in the quotation was written in the context of an issue of the admissibility of evidence. Thus, the language was intended in *Kelley* to show that the scope of proof allowed is generally broad. *Id*. at 195. There is no issue in the present case about the admissibility of evidence.

Second, and more importantly, the Children insist again on ignoring the findings of the trial court in favor of indulging their own suspicions which they try to relate to the language of *Kelley*. We can best explain by illustration. The Children presumably believe that the Niece held some element of fascination for their divorced 98-year-old father. Any such suspicions are in conflict with the trial court's finding that the relationship was wholesome, loving and longstanding. The Children say that the Uncle was "completely at [the] mercy" of the Niece because he was out with her in a car. This argument is in conflict with the trial court's finding that this 98-year-old farmer was still proud and independent and only he knew the way to Mountain City from his home. They say that she picked a lawyer who felt no obligation to look out for the Uncle. The trial court specifically found that before Mr. Cockett would make the deed, he interviewed the Uncle at length. The Children believe that the Uncle's physical and mental impairments prevented him from understanding what was going on. We have dealt with the errors in this argument and need not repeat our discussion here. The Children argue that the Niece did all of this in a veil of secrecy. The trial court found that she and the Uncle in fact informed the family of their intentions the night before the transaction. The Children argue that Mr. Cockett should have talked to the Uncle in private. This argument seems, again, to refuse to acknowledge Mr. Cockett's testimony that he takes special precautions when preparing a document that will be executed by an elderly person. The Children argue that it was unnatural for the Uncle to deed this property to a distant relative to whom he was not particularly close. This argument ignores the finding that the Uncle acquired this property on very favorable terms from his sister, Victoria, and that in deeding the Mountain Land to the Niece he was fulfilling a promise to Victoria. The argument also ignores the finding that the Uncle had a long-standing, wholesome affection for the Niece and that he was having some conflict with his family and with Robert in particular. The Children argue that the Niece was clearly engaged in fraud because she gave conflicting stories when Robert challenged her. The trial court considered the argument and found no such conflict. The Children argue that suspicious circumstances exist because the Niece paid less than the full value of the Mountain Land. It is true that she paid less than the land is worth. The court found that the Uncle resolved to make the Niece a gift of the Mountain Land, provided she would pay him back his out-of-pocket expense of building the road and the pond. It is clear from *Kelley* that the convergence of several

factors might make a case suspicious whereas the existence of only one generally proves nothing. *Id*. at 196. In short, we hold that the factual findings of the trial court make **Kelley** inapposite in the present case.

Simply stated, the evidence does not preponderate against the factual findings of the trial court underpinning the trial court's ultimate conclusion. Furthermore, the trial court, in reaching its ultimate conclusion, correctly applied the relevant law to the facts.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Robert, Reece, individually and as administrator of the estate of Benjamin Harvey Reece; Judy Reece Arwood; Jerry Reece; and Richard Reece. This case is remanded, pursuant to applicable law, for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE